# RAYMOND MOTOR TRANSPORTATION, INC., ET AL. *v.* RICE, SECRETARY, DEPARTMENT OF TRANS-PORTATION OF WISCONSIN, ET AL.

No. 76–558.   Argued November 8–9, 1977—Decided February 21, 1978

*John H. Lederer* argued the cause for appellants. With him on the briefs were *Jack R. DeWitt* and *Jon P. Axelrod.*

*Albert Harriman,* Assistant Attorney General of Wisconsin, argued the cause for appellees. With him on the brief were *Bronson C. La Follette,* Attorney General, *pro se,* and *Charles A. Bleck,* Assistant Attorney General.*

MR. JUSTICE POWELL delivered the opinion of the Court.

We consider on this appeal whether administrative regulations of the State of Wisconsin governing the length and configuration of trucks that may be operated within the State violate the Commerce Clause because they unconstitutionally burden or discriminate against interstate commerce. The three-judge District Court held that the regulations are not unconstitutional on either ground. Because we conclude that they unconstitutionally burden interstate commerce, we reverse.

I

Appellant Raymond Motor Transportation, Inc. (Raymond), a Minnesota corporation with its principal place of business in

---

*Briefs of *amici curiae* urging affirmance were filed by *Theodore L. Sendak,* Attorney General, and *Donald P. Bogard* for the State of Indiana; by *Anthony F. Troy,* Attorney General, *Walter A. McFarlane,* Deputy Attorney General, and *Valentine W. Southall, Jr.,* Assistant Attorney General, for the Commonwealth of Virginia; and by *Richard T. Conway, Harry J. Breithaupt, Jr.,* and *E. Parker Brown* for the Association of American Railroads.

Minneapolis, is a common carrier of general commodities by motor vehicle. Operating pursuant to a certificate of public convenience and necessity granted by the Interstate Commerce Commission, see 49 U. S. C. §§ 306–308, Raymond provides service in eastern North Dakota, Minnesota, northern Illinois, and northwestern Indiana. Its primary interstate route is between Chicago and Minneapolis. It does not serve any points in Wisconsin.

Appellant Consolidated Freightways Corporation of Delaware (Consolidated), a Delaware corporation with its principal place of business in Menlo Park, Cal., also is a common carrier of general commodities by motor vehicle. Consolidated operates nationwide, providing service under a certificate of public convenience and necessity in 42 States and Canada. Among other routes, Consolidated carries commodities between Chicago, Detroit, and points east, and Minneapolis and points west to Seattle. Unlike Raymond, Consolidated does carry commodities between Wisconsin and other States, and it maintains terminals in Milwaukee and Madison where truckloads of goods are dispatched and received.

Both Raymond and Consolidated use two different kinds of trucks. One consists of a three-axle power unit (tractor) which pulls a single two-axle trailer that is 40 feet long. The overall length of such a single-trailer unit (single) is 55 feet. This unit has been used on the Nation's highways for many years and is an industry standard. The other type truck consists of a two-axle tractor which pulls a single-axle trailer to which a single-axle dolly and a second single-axle trailer are attached. Each trailer is 27 feet long, and the overall length of such a double-trailer unit (double) is 65 feet.[1]

The double, which has come into increasing use in recent years, is thought to have certain advantages over the single

---

[1] Appendix A of the District Court opinion contains illustrations of both kinds of trucks. 417 F. Supp. 1352, 1363 (WD Wis. 1976) (*per curiam*).

for general commodities shipping.[2]   Because of these advantages, Raymond would prefer to use doubles on its route between Chicago and Minneapolis.   Consolidated would prefer to use doubles on its routes between Chicago, Detroit, and points east, and Minneapolis and points west, as well as on its routes commencing and ending in Milwaukee and Madison. The most direct route for all of this traffic is over Interstate Highways 90 and 94, both of which cross Wisconsin between Illinois and Minnesota.   State law allows 65-foot doubles to be operated on interstate highways and access roads in Michigan, Illinois, Minnesota, and all of the States west from Minnesota to Washington through which Interstate Highways 90 and 94 run.

Wisconsin law, however, generally does not allow trucks longer than 55 feet to be operated on highways within that State.   The key statutory provision is Wis. Stat. § 348.07 (1) (1975), which sets a limit of 55 feet on the overall length of a vehicle pulling one trailer.[3]   Any person operating a single-trailer unit of greater length must obtain a permit issued by the State Highway Commission.   In addition, § 348.08 (1)

---

[2] A double can carry a greater volume of general commodities than a single, often without exceeding legal limits on gross vehicle weights. Thus, fewer doubles than singles are needed to carry a given amount of cargo, with consequent savings in fuel and drivers' time.   In addition, because the trailers of a double can be routed separately, cargo can be picked up from various shippers, dispatched, and delivered to various destinations more quickly by use of doubles than singles.

[3] Subsequent to the District Court's decision, this section was amended to allow single-trailer units up to 59 feet long to be operated without a permit "providing the cargo or cargo space of the semitrailer is 45 feet or less in length and the truck tractor is within the statutory limit in sub. (1)."   1977 Wis. Laws, ch. 29, § 1487h, adding § 348.07 (2) (g).

Exempted from the length limit of § 348.07 (1) are combinations of mobile homes and their towing vehicles, if their overall length does not exceed 60 feet, § 348.07 (2) (d), and implements of husbandry operated temporarily upon the highway, § 348.07 (2) (e).

provides that no vehicle pulling more than one other vehicle shall be operated on a highway without a permit.[4]

The Commission is authorized to issue various classes of annual permits for the operation of vehicles that do not conform to the above requirements. In particular, it may issue "trailer train" permits for the operation of combinations of more than two vehicles "consisting of truck tractors, trailers, semitrailers or wagons which do not exceed a total length of 100 feet," § 348.27 (6).[5] The Commission may also "impose

---

[4] The District Court assumed that § 348.08 (1) generally allows double-trailer trucks up to 55 feet long to be operated without permits. See 417 F. Supp., at 1354–1355. The State concedes that this assumption was erroneous. Tr. of Oral Arg. 34–37. The section, however, does exempt from its permit requirement combinations of two vehicles pulled by a third and "being transported by the drive-away method in saddle-mount combination," where overall length does not exceed 55 feet, § 348.08 (1) (a); combinations of farm tractors pulling two trailers or one trailer and one implement of husbandry, if the combination is used exclusively for farming and its overall length does not exceed 55 feet, § 348.08 (1) (b); and "tour trains" operated primarily on county and municipal roads for recreational or educational purposes, § 348.08 (1) (c). The terms "drive-away method" and "saddle-mount combination" in § 348.08 (1) (a) are not defined by the statute or regulations, but they apparently refer to a method of towing one four-wheel motor vehicle by resting its front wheels on the back of a second four-wheel motor vehicle. See 49 CFR §§ 390.9, 393.71, and 393.17 (1976).

[5] The Commission also is authorized to issue annual permits to operate overlength vehicles "to industries and to their agent motor carriers owning and operating oversize vehicles in connection with interplant, and from plant to state line, operations in this state," § 348.27 (4); "to pipeline companies or operators or public service corporations for transportation of poles, pipe, girders and similar materials . . . used in its [sic] business," § 348.27 (5); "to companies and individuals hauling peeled or unpeeled pole-length forest products used in its [sic] business," provided that overall length does not exceed 65 feet, § 348.27 (5); "to auto carriers operating 'haulaways' specially constructed to transport motor vehicles," provided that overall length does not exceed 65 feet, § 348.27 (5); "to licensed mobile home transport companies and to licensed mobile home manufacturers and dealers authorizing them to transport oversize mobile homes," § 348.27 (7); to persons transporting "loads of pole length and pulpwood

such reasonable conditions" and "adopt such reasonable rules" of operation with respect to vehicles operated under permit "as it deems necessary for the safety of travel and protection of the highways," § 348.25 (3), including specification of the routes to be used by permittees.

The Commission has issued administrative regulations setting forth the conditions under which "trailer train" and other classes of permits will be issued. Although the Commission is empowered by § 348.27 (6) to issue "trailer train" permits to operate double-trailer trucks up to 100 feet long, its regulations restrict such permits to "the operation of vehicles used for the transporting of municipal refuse or waste, or for the interstate or intra-state operation without load of vehicles in transit from manufacturer or dealer to purchaser or dealer, or for the purpose of repair." Wis. Admin. Code § Hy 30.14 (3)(a) (July 1975). "Trailer train" permits also are issued "for the operation of a combination of three vehicles used for the transporting of milk from the point of production to the point of first processing," § Hy 30.18 (3)(a) (June 1976).

## II

The overture to this lawsuit began when Raymond and Consolidated each applied to the appropriate Wisconsin

---

exceeding statutory length . . . limitations . . . for a distance not to exceed 3 miles from the Michigan-Wisconsin state line," § 348.27 (9); and to other persons "[f]or good cause in specified instances . . . for a specified period . . . [to] allow loads exceeding the size . . . limitations imposed by this chapter," § 348.27 (3).

Section 348.25 (4) provides that permits "shall be issued only for the transporting of a single article or vehicle which exceeds statutory size . . . limitations and which cannot reasonably be divided or reduced to comply with statutory size . . . limitations . . . ." The Commission by regulation, however, exempts general, industrial interplant, and double-trailer milk truck permits from this requirement. Wis. Admin. Code § Hy 30.01 (3) (c) (June 1976). It appears that the Commission interprets § 348.25 (4) to require only that it would be less economical, rather than physically impossible, to divide a load. See App. 200, 210, 211–212.

officials under § 348.27 (6) for annual permits to operate 65-foot doubles on Interstate Highways 90 and 94 between Illinois and Minnesota and, in Consolidated's case, on short stretches of four-lane divided highways between the interstate highways and freight terminals in Milwaukee and Madison.[6] The permits were denied because appellants' proposed operations were not within the narrow scope of the administrative regulations that specify when "trailer train" permits will be issued. Appellants then filed suit in Federal District Court seeking declaratory and injunctive relief on the ground that the regulations barring the proposed operation of 65-foot doubles burden and discriminate against interstate commerce in violation of the Commerce Clause, Art. I, § 8, cl. 3.[7] The complaint alleged that the State's refusal to issue the requested permits disrupts and delays appellants' transportation of commodities in interstate commerce; that 65-foot doubles are as safe as, if not safer than, the 55-foot singles that are allowed to operate on Wisconsin highways without permits; and that the maze of statutory and administrative exceptions to the general prohibition against operating vehicles longer than 55 feet results in " 'over-length' permits [being] routinely granted to classes of vehicles indistinguishable from those of the Plaintiffs in terms of size, safety, and divisibility of loads . . . ." App. 18.

A three-judge District Court was convened pursuant to 28

---

[6] Consolidated also sought authority to operate over Interstate Highway 894, an alternative route which bypasses the Milwaukee metropolitan area.

[7] The complaint named as defendants, individually and in their official capacities, Rice, the Secretary of the Wisconsin Department of Transportation; Huber, the Chairman of the Wisconsin Highway Commission; Sweda and Young, members of the Commission; Volk, the Chief Traffic Engineer of Wisconsin; Versnik, the commanding officer of the Wisconsin State Patrol; and LaFollette, the Attorney General of Wisconsin. We shall refer to the defendants collectively as "the State."

The complaint also stated a claim under the Equal Protection Clause of the Fourteenth Amendment which the District Court rejected and which we do not reach.

U. S. C. § 2281.[8]  After a pretrial conference, the court directed the State to file an amended answer setting forth every justification for its refusal to issue the permits sought, "such as safety, for example."  App. 25.  The State's amended answer advanced highway safety as its sole justification.  *Id.*, at 27–29.  By agreement of the parties, the case was tried on affidavits, depositions, and exhibits.

Appellants presented a great deal of evidence supporting their allegation that 65-foot doubles are as safe as, if not safer than, 55-foot singles when operated on limited-access, four-lane divided highways.  For example, the Deputy Director of the Bureau of Motor Carrier Safety, Federal Highway Administration, United States Department of Transportation, testified on deposition that the Bureau's five-year study of the accident experience of selected motor carriers that use both types of trucks showed that doubles are safer than singles in terms of the number of accidents, injuries, and fatalities per 100,000 miles, and in terms of the amount of property damage and number of injuries and fatalities per accident.  The deponent's own expert opinion was that doubles are safer because of the articulation between the first and second trailers, which allows greater maneuverability and prevents the back wheels of the second trailer from deviating from the path of the front wheels of the tractor (offtracking) as much as the back wheels of a 55-foot single; because loads typically are distributed more evenly in doubles than in singles; and because doubles typically have better braking capability than singles.

Other experts testified that 65-foot doubles brake as well as 55-foot singles, maneuver and track better, are less prone to jackknife, and produce less splash and spray to obscure the vision of drivers in following and passing vehicles.  These

---

[8] Section 2281 was repealed by Pub. L. 94–381, 90 Stat. 1119, the day before the three-judge court's decision in this case.  The repeal, however, did not affect actions commenced on or before its date of enactment.  See § 7 of Pub. L. 94–381, 90 Stat. 1120.

experts agreed that the difference in the amount of time needed to pass a 55-foot single and a 65-foot double has no appreciable effect on motorist safety on limited-access, four-lane divided highways. Appellants also produced depositions and affidavits of state highway safety officials from 12 of the States where 65-foot doubles are allowed on some or all highways; all shared the opinion that 65-foot doubles are as safe as 55-foot singles.[9]

The State, for reasons unexplained, made no effort to contradict this evidence of comparative safety with evidence of its own.[10] The Chairman of the State Highway Commission, while acknowledging the Commission's statutory authority to issue the permits sought by appellants, testified that the regulations preventing their issuance are not based on an administrative assessment of the safety of 65-foot doubles, and he himself was "not prepared to make a statement relative to the safety of these vehicles." App. 250. The reason for the Commission's adoption of these regulations, according to the Chairman, was its belief that the people of the State did not want more vehicles over 55 feet long on the State's highways.[11] The

___

[9] According to a stipulated exhibit, at the time of trial only 17 States and the District of Columbia did not allow 65-foot doubles on their highways. A few more permitted their operation on designated highways, and the rest allowed them on all highways. App. 278. For a more detailed summary of current state laws regulating truck length and configuration, see American Association of State Highway and Transportation Officials, Legal Maximum Dimensions and Weights of Motor Vehicles Compared with AASHTO Standards (1976).

[10] The State did introduce expert testimony that occupants of smaller vehicles are more likely to be killed in collisions with large trucks than occupants of larger vehicles. The study upon which this testimony was based did not distinguish between 55-foot singles and 65-foot doubles, and the State's expert witness had no opinion as to their relative safety. App. 154.

[11] He also said that the state legislature, in response to this feeling, had declined to enact legislation that would have allowed 65-foot doubles to be operated without permits. He interpreted this legislative inaction as

State produced no evidence, nor has it made any suggestion in this Court, that 65-foot doubles are less safe than 55-foot singles because of their extra trailer, as distinguished from their extra length.[12]

Appellants also produced uncontradicted evidence showing that their operations are disrupted, their costs are raised, and their service is slowed by the challenged regulations. For example, Consolidated ordinarily finds it faster and less expensive to use 65-foot doubles to carry interstate freight originating from or destined for Milwaukee and Madison. To comply with Wisconsin law, however, an interstate double bound for Wisconsin must stop before entering the State and detach one of its two trailers. Consolidated then pulls each trailer separately to the freight terminal in Milwaukee or Madison. Likewise, each trailer of a double outbound from one of those cities must be pulled across the Wisconsin state line separately, at which point they are united into a double-trailer combination. Consolidated maintains a crew of drivers in Wisconsin whose sole responsibility is to shuttle second trailers to and from the state line.

On routes through Wisconsin between Chicago and Minneapolis, both Consolidated and Raymond are compelled to use 55-foot singles instead of 65-foot doubles because each trailer of a double would have to be pulled by a separate tractor on the portion of the route that is in Wisconsin. On its long east-west routes from Detroit and Chicago to Seattle, Consolidated must divert doubles south of Wisconsin through Missouri and Nebraska in order to avoid Wisconsin's ban.[13]

---

evidence of a legislative intent that the Commission should not issue permits for such trucks, despite its statutory power to do so.

[12] Indeed, the State agrees that "[a]ppellants have shown that 65 foot twin trailers have as good a safety record as other large vehicles." Brief for Appellees 13.

[13] It appears that 65-foot doubles must be routed as far south as Missouri because Iowa, which Interstate Highway 80 crosses on an east-west route, also bans 65-foot doubles.

These routes would involve a considerably shorter distance if Consolidated's trucks could go through Wisconsin.[14]

Finally, appellants' evidence demonstrated that Wisconsin routinely allows a great number and variety of vehicles over 55 feet long to be operated on the State's highways. App. 178–181.

The three-judge court ruled against appellants. 417 F. Supp. 1352 (WD Wis. 1976) (*per curiam*). The court found that the Wisconsin regulatory scheme does not discriminate against interstate commerce. *Id.*, at 1356–1358. The court also considered "whether the burden imposed upon interstate commerce outweighs the benefits to the local popul[ace]," *id.*, at 1358, and concluded that it did not. It thought that appellants had not shown that the State's refusal to issue permits for appellants' 65-foot doubles had no relation to highway safety, pointing to the fact that, other things being equal, it takes longer for a motorist to pass a 65-foot truck than a 55-foot truck. *Id.*, at 1359. The court considered the expense imposed on appellants to be "of no material consequence." *Id.*, at 1361. We noted probable jurisdiction. 430 U. S. 914 (1977).

## III

Appellants challenge both branches of the District Court's holding. First, they contend that the State's refusal to issue the requested "trailer train" permits under § 348.27 (6) burdens interstate commerce in violation of the Commerce Clause because it substantially interferes with the movement of goods in interstate commerce and makes no contribution to highway

---

[14] An officer of Consolidated estimated that it costs the company in excess of $2 million annually to make the various adjustments in operations that are required by Wisconsin law. An officer of Raymond estimated that the company could save up to $63,000 annually on fuel and up to $102,000 annually on drivers' wages if it could use 65-foot doubles on its route between Chicago and Minneapolis.

safety. Second, they argue that § 348.27 (4), authorizing issuance of "interplant" permits, see n. 5, *supra,* discriminates against interstate commerce in violation of the Commerce Clause because it allows permits to be issued to carry the products of Wisconsin industries, but not of other States' industries, over Wisconsin highways in trucks longer than 55 feet. We find it necessary to address the second contention only as it bears on the first.

By its terms, the Commerce Clause grants Congress the power "[t]o regulate Commerce . . . among the several States . . . ." Long ago it was settled that even in the absence of a congressional exercise of this power, the Commerce Clause prevents the States from erecting barriers to the free flow of interstate commerce. *Cooley* v. *Board of Wardens,* 12 How. 299 (1852); see *Great A&P Tea Co.* v. *Cottrell,* 424 U. S. 366, 370–371 (1976). At the same time, however, it never has been doubted that much state legislation, designed to serve legitimate state interests and applied without discrimination against interstate commerce, does not violate the Commerce Clause even though it affects commerce. *H. P. Hood & Sons, Inc.* v. *Du Mond,* 336 U. S. 525, 531–532 (1949); see *Gibbons* v. *Ogden,* 9 Wheat. 1, 203–206 (1824); *id.,* at 235 (Johnson, J., concurring). "[I]n areas where activities of legitimate local concern overlap with the national interests expressed by the Commerce Clause—where local and national powers are concurrent—the Court in the absence of congressional guidance is called upon to make 'delicate adjustment of the conflicting state and federal claims,' *H. P. Hood & Sons, Inc.* v. *Du Mond, supra,* at 553 (Black, J., dissenting) . . . ." *Great A&P Tea Co.* v. *Cottrell, supra,* at 371; see *Hunt* v. *Washington Apple Advertising Comm'n,* 432 U. S. 333, 350 (1977).

In this process of "delicate adjustment," the Court has employed various tests to express the distinction between permissible and impermissible impact upon interstate com-

merce,[15] but experience teaches that no single conceptual approach identifies all of the factors that may bear on a particular case.[16] Our recent decisions make clear that the inquiry necessarily involves a sensitive consideration of the weight and nature of the state regulatory concern in light of the extent of the burden imposed on the course of interstate commerce. As the Court stated in *Pike* v. *Bruce Church, Inc.,* 397 U. S. 137, 142 (1970):

> "Although the criteria for determining the validity of state statutes affecting interstate commerce have been variously stated, the general rule that emerges can be phrased as follows: Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Huron Cement Co.* v. *Detroit,* 362 U. S. 440, 443. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it

---

[15] *Cooley* v. *Board of Wardens,* 12 How. 299, 319 (1852), distinguished between subjects "imperatively demanding a single uniform rule" and subjects "imperatively demanding that diversity, which alone can meet the local necessities." Other cases have distinguished between state regulations that affect interstate commerce "directly," and those that affect it "indirectly." *E. g., Hall* v. *DeCuir,* 95 U. S. 485, 488 (1878); *Smith* v. *Alabama,* 124 U. S. 465, 482 (1888). And many cases have distinguished between regulations that are an exercise of the State's "police powers," and those that are "regulations of commerce." *E. g., Railroad Co.* v. *Fuller,* 17 Wall. 560, 570 (1873); *Smith* v. *Alabama, supra,* at 482.

[16] See, *e. g., Di Santo* v. *Pennsylvania,* 273 U. S. 34, 44 (1927) (Stone, J., dissenting); *Parker* v. *Brown,* 317 U. S. 341, 362–363 (1943); *Southern Pacific Co.* v. *Arizona ex rel. Sullivan,* 325 U. S. 761, 768–769 (1945); *H. P. Hood & Sons, Inc.* v. *Du Mond,* 336 U. S. 525, 552–553 (1949) (Black, J., dissenting).

could be promoted as well with a lesser impact on inter-
state activities."

Accord, *Great A&P Tea Co.* v. *Cottrell, supra,* at 371–372;
*Hughes* v. *Alexandria Scrap Corp.,* 426 U. S. 794, 804 (1976);
see also *Hunt* v. *Washington Apple Advertising Comm'n,
supra,* at 350.

In the instant case, appellants do not dispute that a State
has a legitimate interest in regulating motor vehicles using its
roads in order to promote highway safety. Nor do they
contend that federal regulation has pre-empted state regula-
tion of truck length or configuration.[17] They argue, however,
that the burden imposed upon interstate commerce by the
Wisconsin regulations challenged here is, in the language of
*Pike* v. *Bruce Church, Inc.,* "clearly excessive in relation to the
putative local benefits." Appellants contend that the regula-
tions were shown by uncontradicted evidence to make no
contribution to highway safety, while imposing a burden on
interstate commerce that is substantial in terms of expense and
delay. They analogize this case to *Bibb* v. *Navajo Freight
Lines,* 359 U. S. 520 (1959), where the Court invalidated an
Illinois law, defended on the ground that it promoted highway
safety, that required trailers of trucks driven within Illinois to
be equipped with contour mudguards.

The State replies that the general rule of *Pike* is not applica-
ble to a State's regulation of motor vehicles in the promotion
of safety. It contends that we should be guided, instead, by
*South Carolina Highway Dept.* v. *Barnwell Bros., Inc.,* 303
U. S. 177 (1938), which upheld over Commerce Clause objec-
tions a state law that set stricter limitations on truck width
and weight than did surrounding States' laws. The State

---

[17] Congress has considered pre-empting this field, but it has not acted.
See, *e. g.,* S. Rep. No. 93–1111, p. 10 (1974); Hearings on Transportation
and the New Energy Policies (Truck Sizes and Weights) before the Sub-
committee on Transportation of the Senate Committee on Public Works,
93d Cong., 2d Sess. (1974).

emphasizes that *Barnwell Bros.* applied a "rational relation" test rather than a "balancing" test, and argues that its regulations bear a rational relation to highway safety: Longer trucks take longer to pass or be passed than shorter trucks.

We acknowledge, as did the Court in *Bibb,* that there is language in *Barnwell Bros.* "which, read in isolation from . . . later decisions . . . , would suggest that no showing of burden on interstate commerce is sufficient to invalidate local safety regulations in absence of some element of discrimination against interstate commerce." 359 U. S., at 528–529. But *Bibb* rejected such a suggestion by stating the test to be applied to state highway regulation in terms similar in principle to the subsequent formulation in *Pike* v. *Bruce Church, Inc.:*

> "Unless we can conclude on the whole record that 'the total effect of the law as a safety measure in reducing accidents and casualties is so slight or problematical as not to outweigh the national interest in keeping interstate commerce free from interferences which seriously impede it' . . . we must uphold the statute." 359 U. S., at 524, quoting *Southern Pacific Co.* v. *Arizona ex rel. Sullivan,* 325 U. S. 761, 775–776 (1945).

Thus, we cannot accept the State's contention that the inquiry under the Commerce Clause is ended without a weighing of the asserted safety purpose against the degree of interference with interstate commerce.

Nevertheless, it also is true that the Court has been most reluctant to invalidate under the Commerce Clause " 'state legislation in the field of safety where the propriety of local regulation has long been recognized.' " *Pike* v. *Bruce Church, Inc., supra,* at 143, quoting *Southern Pacific Co.* v. *Arizona ex rel. Sullivan, supra,* at 796 (Douglas, J., dissenting). In no field has this deference to state regulation been greater than that of highway safety regulation. See, *e. g., Hendrick* v. *Maryland,* 235 U. S. 610 (1915); *Sproles* v. *Binford,* 286 U. S.

374 (1932); *Maurer* v. *Hamilton,* 309 U. S. 598 (1940); *Railway Express Agency, Inc.* v. *New York,* 336 U. S. 106 (1949).[18] Thus, those who would challenge state regulations said to promote highway safety must overcome a "strong presumption of [their] validity." *Bibb, supra,* at 524.

Despite the strength of this presumption, we are persuaded by the record in this case that the challenged regulations unconstitutionally burden interstate commerce. As we have shown, appellants produced a massive array of evidence to disprove the State's assertion that the regulations make some contribution to highway safety. The State, for its part, virtually defaulted in its defense of the regulations as a safety measure. Both it and the District Court were content to assume that the regulations contribute to highway safety because appellants' 65-foot doubles take longer to pass or be passed than the 55-foot singles. Yet appellants produced uncontradicted evidence that the difference in passing time does not pose an appreciable threat to motorists traveling on limited access, four-lane divided highways.[19] They also

---

[18] The Court's special deference to state highway regulations derives in part from the assumption that where such regulations do not discriminate on their face against interstate commerce, their burden usually falls on local economic interests as well as other States' economic interests, thus insuring that a State's own political processes will serve as a check against unduly burdensome regulations. . Compare *South Carolina Highway Dept.* v. *Barnwell Bros.,* 303 U. S. 177, 187 (1938), with *Southern Pacific Co.* v. *Arizona ex rel. Sullivan,* 325 U. S., at 783. It also derives from a recognition that the States shoulder primary responsibility for the construction, maintenance, and policing of their highways, and that highway conditions may vary widely from State to State. See *Bibb* v. *Navajo Freight Lines,* 359 U. S. 520, 523–524 (1959); *Barnwell Bros., supra,* at 187.

[19] The District Court, without mentioning this evidence, suggested that language in *Morris* v. *Duby,* 274 U. S. 135, 144 (1927), and *Buck* v. *Kuykendall,* 267 U. S. 307, 315 (1925), established a principle "that for purposes of judicial review of state highway legislation, size restrictions might be deemed inherently tied to public safety . . . ." 417 F. Supp., at 1360. The language relied upon does not go so far, and it antedates

showed that the Highway Commission routinely allows many other vehicles 55 feet or longer to use the State's highways. In short, the State's assertion that the challenged regulations contribute to highway safety is rebutted by appellants' evidence and undercut by the maze of exemptions from the general truck-length limit that the State itself allows.[20]

Moreover, appellants demonstrated, again without contradiction, that the regulations impose a substantial burden on the interstate movement of goods. The regulations substantially increase the cost of such movement, a fact which is not, as the District Court thought, entirely irrelevant.[21] In addition, the regulations slow the movement of goods in interstate commerce by forcing appellants to haul doubles across the State separately, to haul doubles around the State altogether, or to incur the delays caused by using singles instead of doubles to pick up and deliver goods. See *Bibb*, 359 U. S., at 527. Finally, the regulations prevent appellants from accepting interline transfers of 65-foot doubles for movement through Wisconsin from carriers that operate only in the 33 States where the doubles are legal. See *id.*, at 527–528.[22] In our

---

the era of the limited-access, four-lane divided highways involved in this case. Size restrictions, like other highway safety regulations, are entitled to a strong presumption of validity, but this presumption cannot justify a court in closing its eyes to uncontroverted evidence of record.

[20] The State's failure to present any evidence to rebut appellants' showing in itself sets this case apart from *Barnwell Bros.*, see 303 U. S., at 196, and even from *Bibb*, see 359 U. S., at 525.

[21] The District Court said: "That compliance with Wisconsin regulations imposes added costs upon the plaintiffs is a fact of no material consequence." 417 F. Supp., at 1361, citing *Bibb, supra,* at 526. In *Bibb*, the Court thought that the cost to carriers of installing the mudguards required by Illinois would not, in itself, require invalidation of the Illinois law. See 359 U. S., at 526. But the Court also made it clear that "[c]ost taken into consideration with other factors might be relevant in some cases to the issue of burden on commerce." *Ibid.*

[22] The State contends that its regulations do not interfere with interlining as seriously as the Illinois law at issue in *Bibb* because 65-foot doubles

view, the burden imposed on interstate commerce by Wisconsin's regulations is no less than that imposed by the statute invalidated in *Bibb*.[23]

One other consideration, although not decisive, lends force to our conclusion that the challenged regulations cannot stand. As we have noted, Wisconsin's regulatory scheme contains a great number of exceptions to the general rule that vehicles over 55 feet long cannot be operated on highways within the State. At least one of these exceptions discriminates on its face in favor of Wisconsin industries and against the industries of other States,[24] and there are indications in the record that a

---

"may freely be hauled through Wisconsin, but, of course, they must be hauled one at a time. . . . This does not prevent interlining, it just makes it more expensive." Brief for Appellees 11. This contention overlooks the fact that in *Bibb* interlining could have continued if either the originating or the connecting carriers had been willing to bear the expense of installing the contour mudguards required by Illinois law.

[23] The State argues that this case is distinguishable from *Bibb* because the contour mudguards required by Illinois were illegal in Arkansas, and the straight mudguards required by Arkansas were illegal in Illinois. Here, by contrast, the 55-foot singles that are legal in Wisconsin are not illegal in any other State. But the State fails to appreciate that the conflict between the Illinois and Arkansas requirements in *Bibb* was important because of the added burden of delay and expense that it imposed on carriers operating between the two States. The conflict would have required such carriers to stop somewhere between Illinois and Arkansas, either to shift cargo from one trailer to another, 359 U. S., at 526, or to change mudguards on the original trailer, *id.*, at 527.

We also note that the interference with interlining that weighed in the *Bibb* decision did not result from the conflict between the Illinois and Arkansas requirements, but rather from the fact that many originating carriers did not operate in Illinois and hence "would not be expected to equip [their] trailers with contour mudguards." *Id.*, at 528.

[24] Under Wis. Stat. § 348.27 (4) (1975), the Commission issues permits to Wisconsin industries and their agent motor carriers to transport goods in trucks over 55 feet long from plants in Wisconsin to the state line, and thence to markets in other States, but it does not issue permits to industries with plants in other States to transport goods in trucks over 55 feet long *through* Wisconsin to markets in other States. The District Court's

number of the other exceptions, although neutral on their face, were enacted at the instance of, and primarily benefit, important Wisconsin industries. Viewed realistically, these exceptions may be the product of compromise between forces within the State that seek to retain the State's general truck-length limit, and industries within the State that complain that the general limit is unduly burdensome. Exemptions of this kind, however, weaken the presumption in favor of the validity of the general limit, because they undermine the assumption that the State's own political processes will act as a check on local regulations that unduly burden interstate commerce. See n. 18, *supra*.

## IV

On this record, we are persuaded that the challenged regulations violate the Commerce Clause because they place a substantial burden on interstate commerce and they cannot be said to make more than the most speculative contribution to highway safety. Our holding is a narrow one, for we do not decide whether laws of other States restricting the operation of trucks over 55 feet long, or of double-trailer trucks, would be upheld if the evidence produced on the safety issue were not so overwhelmingly one-sided as in this case.[25] The State of

---

*sua sponte* speculation that industries in States other than Wisconsin also might be eligible for permits under § 348.27 (4), see 417 F. Supp., at 1357 n. 9, is refuted by the record, see App. 257–258, and was disavowed by the State, Tr. of Oral Arg. 30; see Brief for Appellees 4.

Given our conclusion that the regulations preventing issuance of the requested permits unconstitutionally burden interstate commerce, we find it unnecessary to decide whether appellants would be entitled to relief solely on the basis of the discrimination against interstate commerce embodied in § 348.27 (4). Compare Brief for Appellees 4, and Brief for Association of American Railroads as *Amicus Curiae* 20, with Reply Brief for Appellants 39. Neither do we intimate that nondiscriminatory exceptions to general length, width, or weight limits are inherently suspect. Cf. *Sproles* v. *Binford*, 286 U. S. 374, 391–396 (1932).

[25] As one commentator has written, Commerce Clause adjudication must depend in large part "upon the thoroughness with which the lawyers

Wisconsin has failed to make even a colorable showing that its regulations contribute to highway safety. The judgment of the District Court is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.

MR. JUSTICE BLACKMUN, with whom THE CHIEF JUSTICE, MR. JUSTICE BRENNAN, and MR. JUSTICE REHNQUIST join, concurring.

I join the opinion of the Court, but I add these comments to emphasize the narrow scope of today's decision.

First, the Court's reliance on *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137 (1970), does not signal, for me, a new approach to review of state highway safety regulations under the Commerce Clause. Wisconsin argues that the Court previously has refused to balance safety considerations against burdens on interstate commerce. Brief for Appellees 8. This contention misreads *Bibb* v. *Navajo Freight Lines,* 359 U. S. 520 (1959), which recognized the Court's responsibility to weigh the national interest in free-flowing commerce against " 'slight or problematical' " safety interests. *Id.,* at 524, quoting *Southern Pacific Co.* v. *Arizona ex rel. Sullivan,* 325 U. S. 761, 776 (1945).

Second, the reliance on *Pike* should not be read to equate the factual balance struck here with the balance established in *Pike* regarding the Arizona Fruit and Vegetable Standardization Act. Arizona prohibited interstate shipment of canta-

___

perform their task in the conduct of constitutional litigation. Here, as in many other fields, constitutionality is conditioned upon the facts, and to the lawyers the courts are entitled to look for garnering and presenting the facts." Dowling, Interstate Commerce and State Power, 27 Va. L. Rev. 1, 27–28 (1940).

loupes not "packed in regular compact arrangement in closed standard containers." 397 U. S., at 138, quoting Ariz. Rev. Stat. Ann. § 3–503C (Supp. 1969). Application of the prohibition to the appellee grower would have prevented it from processing its cantaloupes just across the state line in California, and would have required it to construct a packing facility in Arizona. The State attempted to justify this burden on interstate commerce solely by its interest "to promote and preserve the reputation of Arizona growers by prohibiting deceptive packaging." 397 U. S., at 143. More specifically, Arizona wanted the appellee to package the cantaloupes in the State so that the high-quality fruit could be advertised as grown in Arizona rather than California. Although recognizing the legitimacy of the State's interest, the Court refused to accord the concern much weight in the Commerce Clause balancing:

> "[T]he State's tenuous interest in having the company's cantaloupes identified as originating in Arizona cannot constitutionally justify the requirement that the company build and operate an unneeded $200,000 packing plant in the State." *Id.*, at 145.

In short, despite the unchallenged existence and legitimacy of the State's interest, the Court determined that the interest was not important enough to justify the burden on commerce.

Neither the *Pike* opinion nor today's decision suggests that a similar balance would be struck when a State legitimately asserts the existence of a safety justification for a regulation. In *Pike* itself the Court noted that it did not confront " 'state legislation in the field of safety where the propriety of local regulation has long been recognized.' " *Id.*, at 143, quoting *Southern Pacific Co.* v. *Arizona ex rel. Sullivan*, 325 U. S., at 796 (Douglas, J., dissenting). In other words, if safety justifications are not illusory, the Court will not second-guess legislative judgment about their importance in comparison with related burdens on interstate commerce. I therefore join

the opinion of the Court because its ultimate balancing does not depart from this principle, as stated in *Bibb* v. *Navajo Freight Lines:*

> "These safety measures carry a strong presumption of validity when challenged in court. If there are alternative ways of solving a problem, we do not sit to determine which of them is best suited to achieve a valid state objective. Policy decisions are for the state legislature, absent federal entry into the field." 359 U. S., at 524.

Here, the Court does not engage in a balance of policies; it does not make a legislative choice. Instead, after searching the factual record developed by the parties, it concludes that the safety interests have not been shown to exist as a matter of law.

Third, the illusory nature of the safety interests in this case is illustrated not only by the overwhelming empirical data submitted by the appellants, but also by the State's willingness to permit the use of oversized vehicles under the numerous administrative exceptions for in-state manufacturers and important Wisconsin industries. See *ante,* at 433–434, nn. 4–5, and 446–447. From 1973 through June 1975, the State issued 43,900 annual or general permits for the use of vehicles longer than 65 feet. Brief of Plaintiffs before the District Court in Case No. 75–C–172, App. C, 10–11. An additional 16,760 single-trip permits were granted during the same period. *Id.,* at 11. Despite the alleged safety problems, the State regularly permitted the use of oversized vehicles merely to lower the cost of transportation for in-state industries. The bulkiness of the cargoes frequently did not justify the permits. See Deposition of Robert T. Huber, Chairman of the Wisconsin State Highway Commission, 7–9, 21; Deposition of Wayne Volk, Chief Traffic Engineer, Wisconsin Department of Transportation, 31, 36, 49–50, 53. American Motors, one of the State's largest employers, received permission to use oversized trucks on the 45-mile stretch of highway between Milwaukee

and Kenosha, even though the State's Chief Traffic Engineer conceded that the road was heavily traveled. Deposition of Wayne Volk, *supra,* at 32. Furthermore, Stoughton Body Co., a Wisconsin manufacturer of trailers, received permits to pull oversized, double-trailer vehicles on a two-lane highway to facilitate out-of-state deliveries. *Id.,* at 52–54. The record therefore suggests that the State in practice does not believe that oversized, double-trailer vehicles present a threat to highway safety.

Nineteen years after *Bibb,* then, the Court has been presented with another of those cases—"few in number"—in which highway safety regulations unconstitutionally burden interstate commerce. See 359 U. S., at 529. The contour-mudflaps law burdened the flow of commerce through Illinois in 1959 just as the length and configuration regulations burden the flow through Wisconsin today. It was shown that neither the mudflaps law nor the regulations contributed to highway safety. Giving the same legislative leeway to Wisconsin that the Court gave to Illinois, *Bibb* v. *Navajo Freight Lines* requires reversal of the judgment of the District Court.