2023 IL App (4th) 221038

NO. 4-22-1038

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 13, 2023
Carla Bender
4th District Appellate
Court, IL

| | |
|---|---|
| SAVE OUR ILLINOIS LAND and WILLIAM KLINGELE,<br>        Appellants,<br>        v.<br>THE ILLINOIS COMMERCE COMMISSION; DAKOTA ACCESS, LLC; ENERGY TRANSFER CRUDE OIL COMPANY, LLC; INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 702; LABORERS' INTERNATIONAL UNION OF NORTH AMERICA; SOUTHWESTERN ILLINOIS LABORERS' DISTRICT COUNCIL; GREAT PLAINS LABORERS' DISTRICT COUNCIL; and SOUTHERN AND CENTRAL ILLINOIS LABORERS' DISTRICT COUNCIL AND ITS AFFILIATED LOCAL UNIONS 231, 622, 773, AND 1197,<br>        Appellees. | Appeal from an Order of the Illinois Commerce Commission<br><br><br><br>Docket No. 19-0673 |

JUSTICE CAVANAGH delivered the judgment of the court, with opinion.
Justices Harris and Steigmann concurred in the judgment and opinion.

## OPINION

¶ 1    Pursuant to section 8-503 of the Public Utilities Act (Act) (220 ILCS 5/8-503 (West 2020)), Dakota Access, LLC (Dakota Access), and Energy Transfer Crude Oil Company, LLC (Energy Transfer) (hereinafter, "the carriers"), petitioned the Illinois Commerce Commission (Commission) for authorization to construct additional pumping stations on the Illinois portion of their crude-oil pipelines. The Commission granted their petition. Save Our Illinois Land and

William Klingele (hereinafter, "the objectors") appeal. We affirm the Commission's decision. The Commission could reasonably find that the proposed pumping stations were "necessary" "to promote the security or convenience of *** the public." *Id.*

¶ 2                                I. BACKGROUND

¶ 3        The carriers are in the business of shipping crude oil by the Bakken pipeline system. The Dakota Access pipeline begins in the Bakken, Three Forks, and Williston oil fields of northwest North Dakota and runs southeast through North Dakota, South Dakota, and Iowa; enters Illinois at Hamilton; and continues running southeast through Illinois to the crude-oil terminal and hub at Patoka. There the Energy Transfer pipeline connects to the Dakota Access pipeline; runs southwest to Joppa; and then continues southwest through Kentucky, Tennessee, Mississippi, Arkansas, and Louisiana to the crude-oil terminals at Nederland, Texas, on the Gulf Coast. Since December 2015, the carriers have had certificates in good standing, pursuant to section 15-401 of the Act (*id.* § 15-401), to operate the Illinois portion of their pipelines.

¶ 4        In June 2019, the carriers filed with the Commission a joint petition under section 8-503 (*id.* § 8-503) to build new pumping stations and new pumps on their pipelines so as to increase the throughput of the pipelines from 570,000 barrels per day to 1.1 million barrels per day. Specifically, the carriers sought authorization to (1) build a new pump station in Hancock County, along the Dakota Access pipeline, (2) install two new pumps and replace two pumps at an existing pump station in Patoka, and (3) build a new pump station along the Energy Transfer pipeline in Massac County. No eminent domain would be necessary for this pumping-station project. The expected cost of the Illinois portion of the project would be $190 million to $200 million. The carriers informed the Commission that they had entered into long-term transportation shipping agreements with shippers that committed them—both the carriers and the shippers—to

sending greater volumes of oil through the Illinois pipelines than the pipelines could handle without the additional pumping capacity.

¶ 5        For essentially three reasons, the objectors opposed the proposed improvements. First, the objectors argued there was no need for an increase in throughput, considering that the COVID-19 pandemic had greatly reduced the worldwide demand for oil and that refineries were already operating at close to full capacity. Second, in the objectors' view, an increase in throughput would be of no benefit to the Illinois public but, instead, would benefit a relatively small group of market players. Third, the objectors predicted adverse environmental consequences from the additional pumps and pumping stations. The objectors warned that increasing the throughput of the pipelines by some 500,000 barrels per day would make a pipeline leak, should one ever occur, all the more calamitous. Also, in the objectors' view, the additional pumping capacity would have the effect of accelerating climate change.

¶ 6        On October 14, 2020, after evidentiary hearings, the Commission authorized the proposed project. In the Commission's view, the long-term shipping contracts, together with the carriers' willingness to spend hundreds of millions of dollars on additional pumping stations and pumps, tended to prove a demand for increased throughput. The carriers' pipelines met federal safety standards. Finally, the Commission reasoned that it would be less damaging to the climate, and would be safer for the Illinois public, if the additional 500,000 barrels of crude oil per day were transported through the carriers' rural pipelines instead of by trains and trucks, which would pass back and forth through populated areas.

¶ 7        The carriers appealed. See *id.* § 10-201(a). We vacated the Commission's decision and remanded the case to the Commission with directions to issue a new decision. *Save Our Illinois Land v. Illinois Commerce Comm'n*, 2022 IL App (4th) 210008, ¶ 188. We disavowed any

intention to express a view on whether permission to make the proposed improvements should be granted. *Id.* But we directed that, this time, instead of regarding "the public" in section 8-503 (220 ILCS 5/8-503 (West 2020)) as being the world, the Commission regard "the public" "as being, at its broadest, the people of the United States." *Save Our Illinois Land*, 2022 IL App (4th) 210008, ¶ 188. Also, we directed the Commission to take into consideration the regulatory violations that the operator of the carriers' pipelines, Sunoco, had committed in Pennsylvania—evidence that the Commission had previously ruled to be irrelevant. *Id.*

¶ 8         In September 2022, on remand, the Commission issued a new decision that complied with our directions. In its decision on remand, the Commission again authorized the construction of the proposed pumping stations and pumps.

¶ 9         The objectors appeal.

¶ 10                          II. ANALYSIS

¶ 11         In deciding whether to authorize a proposed addition to the physical property of a "public utility," which is defined to include the owner of a pipeline (see 220 ILCS 5/3-105(a)(3) (West 2020)), the Commission must consider whether the addition is "necessary and ought reasonably to be made" and whether the addition would "promote the security or convenience of *** *the public*." (Emphasis added.) *Id.* § 8-503. In our previous decision in this case, we concluded that "the public," in section 8-503, could not be plausibly interpreted as meaning the world. *Save Our Illinois Land*, 2022 IL App (4th) 210008, ¶ 74. We concluded, instead, that "the public" meant the Illinois public. *Id.* ¶ 161. The Commission, an Illinois administrative agency, "was created to serve the Illinois public." *Id.*

¶ 12         In the next sentence of our previous decision, however, we qualified our Illinois-centric interpretation by cautioning that a decision by the Commission may not unconstitutionally

burden interstate commerce. *Id.* As we explained, "the needs and benefits of the American public could be indirectly relevant, considering that, under the dormant commerce clause (U.S. Const., art. I, § 8, cl. 3), 'the burden imposed on [interstate] commerce' cannot be 'clearly excessive' compared to the 'putative local benefits.' " *Id.* ¶ 161 (quoting *Lakehead Pipeline Co. v. Illinois Commerce Comm'n*, 296 Ill. App. 3d 942, 952 (1998)). This elucidation of the dormant commerce clause came ultimately from *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970), in which the United States Supreme Court held:

"Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. [Citation.] If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities."

¶ 13        If we had interpreted section 8-503 as invariably conditioning the approval of a project on whether the project would benefit the Illinois public, regardless of the effect on interstate commerce, the statute would have conflicted with *Pike*. Under *Pike*, the incidental burden on interstate commerce must "effectuate a legitimate local public interest." *Id.* That is, not the project but the burden on interstate commerce from rejecting the project must "effectuate a legitimate local public interest." *Id.* Thus, the Commission would be unable to defend an incidental burden on interstate commerce by arguing that removing the burden, *i.e.*, approving the project, would yield no benefit to the Illinois public. If rejecting the proposed pumping stations would incidentally burden interstate commerce, the rejection could not be justified by asserting the lack of evidence

that the pumping stations would "promote the security or convenience of *** the [Illinois] public." 220 ILCS 5/8-503 (West 2020). To prevent section 8-503 from inflicting the "economic Balkanization" that the commerce clause is supposed to prevent, we interpret "the public" to be as broad as the United States whenever interstate commerce is implicated. (Internal quotation marks omitted.) *Oregon Waste Systems, Inc. v. Department of Environmental Quality of Oregon*, 511 U.S. 93, 98 (1994); see also *Davis v. Brown*, 357 Ill. App. 3d 176, 182 (2005) (observing that a statute should be interpreted so as to make it constitutional, provided that such an interpretation is reasonable). Section 8-503 should not be interpreted as encouraging violations of the dormant commerce clause. See *Lakehead Pipeline Co.*, 296 Ill. App. 3d at 952 (agreeing with the appellant that "requiring proof of a local public need" as a condition of issuing a certificate in good standing "would conflict with the commerce clause"). We interpret the statutory phrase "the security or convenience of *** the public" as incorporating *Pike*. See 220 ILCS 5/8-503 (West 2020). Inherent in the commerce clause is the public-policy judgment that the free flow of goods from one state to another benefits the American public.

¶ 14        Thus, even if the objectors are right that Illinois, without any significant benefit to itself, merely accommodates a conduit for the interstate movement of crude oil, the conduit is constitutionally protected. Because interstate commerce is implicated, it is irrelevant whether the proposed pumping stations would benefit the Illinois public. When the free flow of goods across state lines is at stake, the meaning of "the public" in section 8-503 expands to the United States public, the beneficiary of unimpeded interstate commerce. See Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/public (last visited May 26, 2023) [https://perma.cc/6X5U-5MJU] (listing "POPULACE" as a synonym for the noun "public"); Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/populace

(last visited May 26, 2023) [https://perma.cc/765N-QYH9] (noting that "[p]opulace is usually used to refer to all the people of a country" (emphasis in original)). The dormant commerce clause prohibits Illinois from gratuitously "burden[ing] or imped[ing]" the flow of goods across state lines or from "impair[ing] the usefulness of [the] facilities for" the interstate flow of goods. *Illinois Central R.R. Co. v. Illinois*, 163 U.S. 142, 154 (1896). If Illinois imposes an incidental burden on the conduit, the burden must be beneficial to the people of the state, and "the burden imposed on such commerce" must not be "clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142.

¶ 15          A burden on interstate commerce is a "barrier[ ] to the free flow of interstate commerce." *Raymond Motor Transportation, Inc. v. Rice*, 434 U.S. 429, 440 (1978). In this case, the flow is literal. Denying permission to install the additional pumping stations would erect a barrier to the free flow of about half a million barrels of crude oil per day from North Dakota to Texas. Such a denial would be an incidental burden on interstate commerce.

¶ 16          A burden on interstate commerce is incidental if the burden is nondiscriminatory. Discrimination "means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter," in contrast to state laws that "regulate[ ] evenhandedly with only incidental effects on interstate commerce." (Internal quotation marks omitted.) *Oregon Waste Systems*, 511 U.S. at 99. A ban on additional pumping stations and pumps would be nondiscriminatory; it would not treat in-state and out-of-state interests differently. Nevertheless, as the Supreme Court held in *Raymond*, even a nondiscriminatory burden on interstate commerce must be justified by a "legitimate local purpose"—and then "the extent of the burden that will be tolerated will *** depend on the nature of the local interest involved, and on whether it could be

promoted as well with a lesser impact on interstate activities." (Internal quotation marks omitted.) *Raymond*, 434 U.S. at 441.

¶ 17        In *Raymond*, a Wisconsin statute provided that any person who would operate a truck longer than 55 feet on a Wisconsin highway had to obtain a permit from the state highway commission. *Id.* at 432. Because the statute applied to all trucks, regardless of whether they were from Wisconsin or from any other state, the statute was facially nondiscriminatory. The statute, however, imposed an incidental burden on interstate commerce. For the trucking companies who appealed in *Raymond*, it was cheaper and more efficient to use double-trailer units, which were 65 feet long, than to use single-trailer units, which were 55 feet long. *Id.* at 438. Double-trailer units were what the trucking companies typically used in surrounding states. Because of the Wisconsin ban, interstate doubles had to detach one of their trailers upon reaching the Wisconsin border, hitch the trailer to another tractor, pull the trailers separately across Wisconsin, and then reunite the trailers after leaving Wisconsin. *Id.* Alternatively, doubles had to be diverted through Missouri and Nebraska. *Id.* Because the trucking companies could not obtain permits from the state highway commission (see *id.* at 435), detachment or diversion were the only options. The evidence was uncontradicted that Wisconsin's regulation disrupted operations of the trucking companies, raised their costs, and slowed their service. *Id.* at 438.

¶ 18        This burden on interstate commerce lacked any proven justification. Wisconsin adduced no evidence that its double-trailer ban made highways safer. *Id.* at 437-38. In fact, the trucking companies "presented a great deal of evidence supporting their allegation that 65-foot doubles [were] as safe as, if not safer than, 55-foot singles when operated on limited-access, four-lane divided highways." *Id.* at 436. The only reason that Wisconsin gave for the ban was the state highway commission's "belief that the people of the State did not want more vehicles over 55 feet

long on the State's highways." *Id.* at 437. It was uncontradicted, though, that the double-trailer ban "impose[d] a substantial burden on the interstate movement of goods" by slowing the movement and increasing its cost, without any benefit to highway safety. *Id.* at 445. Therefore, the Supreme Court held that "the challenged regulations unconstitutionally burden[ed] interstate commerce." *Id.* at 444.

¶ 19        Just as the double-trailer ban in *Raymond* caused a bottleneck in the interstate movement of goods by road, a train-car limitation in *Southern Pacific Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761 (1945), caused a bottleneck in the interstate movement of goods by rail. In *Southern Pacific*, the Supreme Court considered the constitutionality of an Arizona statute forbidding, within the state, the operation of a train having more than 14 passenger cars or more than 70 freight cars. *Id.* at 763. This statute made Arizona an outlier. "[O]ver the main lines of the railroads of the United States," it was "standard practice" to operate trains having more than 14 passenger cars or more than 70 freight cars. *Id.* at 771. Longer trains were cheaper to operate than shorter trains. *Id.* at 772. Arizona's train-limit law cost "the two railroads traversing that state" an additional $1 million a year. *Id.* The Supreme Court continued:

> "The reduction in train lengths also impedes efficient operation. More locomotives and more manpower are required; the necessary conversion and reconversion of train lengths at terminals and the delay caused by breaking up and remaking long trains upon entering and leaving the state in order to comply with the law, delays the traffic and diminishes its volume moved in a given time, especially when traffic is heavy." *Id.*

"[T]he enforcement of the Arizona statute result[ed] in freight trains being broken up and reformed at the California border and in New Mexico, some distance from the Arizona line." *Id.* at 774.

Thus, "[t]he practical effect of such regulation [was] to control train operations beyond the boundaries of the state exacting it." *Id.* at 775.

¶ 20    The Supreme Court in *Southern Pacific* acknowledged the "residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect[ed] interstate commerce." *Id.* at 767. But the local concern that the train-limit law addressed was faint or nonexistent, whereas the impediment to "the free flow of commerce from state to state" was substantial. *Id.* The trial court had "found that the Arizona law had no reasonable relation to safety" and that, in fact, the law "made train operation more dangerous." *Id.* at 775. Evidence showed that as the number of trains increased, so did the number of accidents. *Id.*

¶ 21    The "decisive question," then, was

> "whether in the circumstances the total effect of the law as a safety measure in reducing accidents and casualties [was] so slight or problematical as not to outweigh the national interest in keeping interstate commerce free from interferences which seriously impede[d] it and subject[ed] it to local regulation which [did] not have a uniform effect on the interstate train journey which it interrupt[ed]." *Id.* at 776-77.

To that question, the Supreme Court answered yes. *Id.* at 781. "[T]he state interest [was] outweighed by the interest of the nation in an adequate, economical[,] and efficient railway transportation service, which [had to] prevail." *Id.* at 783-84. In short, Arizona's train-limit law violated the dormant commerce clause.

¶ 22    If the Commission had denied the carriers permission to install additional pumping stations and pumps on the Illinois portion of their crude-oil pipelines, the denial would have been

comparable, in three ways, to the double-trailer ban in *Raymond* and to the train-limit law in *Southern Pacific*.

¶ 23    First, denying permission to install the pumping stations on the Illinois portion of the interstate pipelines would have made Illinois an outlier, causing a bottleneck comparable to that in *Raymond* or *Southern Pacific*. The carriers argued to the Commission:

> "[R]efusing to approve the installation of the improvements in Illinois to increase the pipeline's capacity and daily throughput capabilities, which every other state [that the carriers'] pipelines traverse has either formally approved or did not require any separate approval, would clearly interfere with the flow of interstate commerce among these states."

We quote from the decision the Commission issued on remand, in which the Commission summarized the parties' positions.) The objectors do not appear to dispute that argument by the carriers. Denying permission to install the new pumping stations would cause the Illinois portion of the carriers' pipelines to have less throughput capacity than the out-of-state portions of the carriers' pipelines. Illinois would be, in a manner of speaking, a partial obstruction to an otherwise unobstructed pipeline system.

¶ 24    Second, the Commission found that denying permission to install the pumping stations would make the interstate transportation of some half a million barrels per day of crude oil slower, more costly, less efficient, and less safe. We deem this finding to be, *prima facie*, true and correct. See 220 ILCS 5/10-201(d) (West 2020). The objectors have not shown this finding to be against the manifest weight of the evidence. See *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008). It is undisputed that the pumping stations would increase the throughput of the carriers' pipelines from 570,000 barrels per day to a

maximum of 1.1 million barrels per day. The Commission reasonably found that "there [was] a demand to transport an additional 500,000 [barrels per day] from the Bakken-Three Forks region to Patoka, Illinois[,] or Nederland, Texas," and that "the pipeline [was] currently operating at capacity." We defer to the Commission's reasoning that the long-term shipping contracts, together with the carriers' willingness to spend $190 million to $200 million on the construction of the pumping facilities, tend to prove "a supply of crude oil at one end of the pipeline and a purchaser for the crude oil at the other end." The Commission observed, "There is no dispute that the pipeline is currently operating at capacity and [that] the transportation of crude oil from the Bakken-Three Forks region will occur, if not on [the carriers'] pipelines, then by rail or truck." In other words, the half a million barrels of crude oil per day that, because of the lack of additional pumping capacity, the carriers' pipelines would be unable to handle would be transported from North Dakota to Texas by truck and rail. We accept, as true and correct on its face, the Commission's finding that transporting this oil by the rural pipelines would be safer, more efficient, and less damaging to the environment than transporting it by trucks and trains, which would continually travel back and forth, through populated areas, between North Dakota and Gulf Coast. We likewise defer to the Commission's factual finding that the cost of shipping the crude oil by pipeline would range from $2 to $5 per barrel compared to $10 to $15 per barrel by train and $10 to $20 per barrel by truck. All of these findings are supported by substantial evidence in the record (see *Central Illinois Public Service Co. v. Illinois Commerce Comm'n*, 268 Ill. App. 3d 471, 476 (1994)), and they suggest that rejecting the additional pumping stations and pumps would impose a significant burden on interstate commerce.

¶ 25        Third, as in *Raymond* and *Southern Pacific*, the putative local benefits from burdening interstate commerce are unproven. Avoiding risk from a design vulnerability of the

pipelines cannot serve as a benefit, for interstate oil-pipeline safety is federally preempted. See *Save Our Illinois Land*, 2022 IL App (4th) 210008, ¶ 90. As for pipeline-operator safety, the Commission found:

> "The evidence shows that Sunoco's safety record has improved significantly. The [carriers' Illinois] pipelines have been in service since 2017 and have had a good safety record. The Commission notes that [the objectors] did not present any evidence taking issue with Sunoco's operations of the [carriers'] pipelines in Illinois. Many of the issues that are present in Pennsylvania are not present with [the carriers'] pipeline in Illinois."

We are unable to say that those findings are against the manifest weight of the evidence. See *Cinkus*, 228 Ill. 2d at 210. Consequently, there would be no "putative local benefits" (*Pike*, 397 U.S. at 142) to justify the "substantial burden on the interstate movement of goods"—in this case, crude oil (*Raymond*, 434 U.S. at 445).

¶ 26        In sum, when deciding whether to approve the addition of pumping stations and pumps to the Illinois portion of a pipeline that begins in North Dakota and runs to Texas, the Commission could not legitimately ignore the implications for interstate commerce. The Commission could reasonably find that denying the carriers permission to install additional pumping stations on their pipeline would burden or slow down interstate commerce (see *id.*) or would "erect[ ] [a] barrier[ ] to the free flow of interstate commerce" (*id.* at 440). Finally, the Commission could reasonably find that there are no "legitimate state interests" to minimally justify such a burden. See *id.* We defer, therefore, to the Commission's conclusion that the installation of the proposed additional pumping stations and pumps is "necessary and ought reasonably to be made" for "the security or convenience of *** the public." 220 ILCS 5/8-503 (West 2020).

## III. CONCLUSION

For the foregoing reasons, we affirm the Commission's decision.

Affirmed.

| | |
|---|---|
| **Decision Under Review:** | Petition for review of order of Illinois Commerce Commission, No. 19-0673. |
| **Attorneys for Appellant:** | William M. Shay and Rhonda L. Heinz, of Westervelt, Johnson, Nicoll & Keller, LLC, of Peoria, for appellants. |
| **Attorneys for Appellee:** | Robert W. Funk, Brian J. Dodds, and Thomas R. Stanton, Special Assistant Attorneys General, of Chicago, for appellee Illinois Commerce Commission.

Jeff Naville, of Attorney Laborers' Midwest Region, of Springfield, and Patrick K. Shinners, of Schuchat, Cook & Werner, of St. Louis, Missouri, for appellees International Brotherhood of Electrical Workers, Local 702; Laborers' International Union of North America; Southwestern Illinois Laborers' District Council; Great Plains Laborers' District Council; and Southern and Central Illinois Laborers' District Council and Its Affiliated Local Unions, 231, 622, 773, 1197.

Claire A. Manning, of Brown Hay & Stephens, LLP, of Springfield, Owen MacBride, Amy Antoniolli, and Meera Gorjala, of ArentFox Schiff LLP, of Chicago, and Bret Dublinske, of Fredrikson & Byron, P.A., of Des Moines, Iowa, for other appellees. |