**SANTA MONICA AIRPORT ASSOCIATION, a California non-profit corporation, Plaintiff,**

**and**

**National Business Aircraft Association, a New York not-for-profit corporation, General Aviation Manufacturers Association, a District of Columbia non-profit corporation, Plaintiffs-Intervenors,**

**v.**

**CITY OF SANTA MONICA, a municipal corporation, Perry Scott, Nathaniel Trives, Donna Swink, Seymour Cohen, John J. Brambrick, Christine Reed, and Pieter Van Den Steenhoven, Defendants.**

**No. CV 77–2852–IH.**

United States District Court, C. D. California.

Sept. 10, 1979.

928

Robert N. Cleaves, Marina Del Rey, Cal., for plaintiff.

Judith Richards Hope (argued), Wald, Harkrader & Ross, Washington, D. C., Joseph A. Wheelock, Jr., Latham & Watkins, Los Angeles, Cal., Stanley J. Green for Gen. Aviation Mfrs. Assn., Washington, D. C., for plaintiffs-intervenors.

Richard L. Knickerbocker, City Atty., Gene E. Penn, Santa Monica, Cal., for City of Santa Monica.

Sylvia O. Cano (argued), Atty. Gen., Los Angeles, Cal., for People of the State of California amicus curiae.

Gene E. Penn, Santa Monica, Cal. (argued), for Sierra Club amicus curiae.

Leland C. Dolley, Los Angeles, Cal., for City of El Segundo and City of Lomita amici curiae.

Raymond M. Larizza (argued), Dept. of Justice, Washington, D. C., for the United States amicus curiae.

Leonard A. Ceruzzi (argued), Federal Aviation Administration, Washington, D. C., for the Federal Aviation Administration amicus curiae.

## OPINION

### Introduction

IRVING HILL, Chief Judge.

The material which appears hereafter under the heading "Oral Opinion" was deliv-

ered orally from the bench as the final decision of the instant case. Having been so delivered, the Oral Opinion does not purport to be a full and comprehensive discussion of all the applicable law bearing on the issues presented. The Oral Opinion is submitted for publication at the request of counsel for all parties.

For the Oral Opinion to be understood in its proper context, it is felt that a preliminary statement should be included in this published version in order to set forth the facts of the case with greater particularity than orally stated and to describe the adjudications made prior to delivery of the Oral Opinion.

This case concerns the Santa Monica airport, an airport owned and operated by the City of Santa Monica and located within its boundaries. The airport cannot accommodate commercial airlines because of its short runways. Santa Monica has a population of approximately 100,000. It is located in what is called the "Greater Los Angeles area," a densely populated urban community. The airport is surrounded on three sides by residential neighborhoods. On the fourth side (the North side) there are some new condominiums, some commercial developments and some vacant land.

### The Parties

The Plaintiff in the instant action, Santa Monica Airport Association (hereinafter "SMAA"), is a non-profit membership corporation having about 500 members. The membership consists of pilots and owners of aircraft who use the Santa Monica Municipal airport and concerns who operate aviation-oriented businesses at the airport and elsewhere. The Plaintiff prosecutes the action on its own behalf and on behalf of its members.

By leave of Court, two separate entities became Plaintiffs-Intervenors. These are: (1) National Business Aircraft Association (hereinafter "NBAA"); and (2) General Aviation Manufacturers Association (hereinafter "GAMA"). NBAA is a New York non-profit corporation whose over 1,700 members are business entities who own and operate aircraft as an aid to the conduct of their business. One hundred of its members are located in California. GAMA is a District of Columbia non-profit corporation whose members manufacture general aviation aircraft and aircraft components. It exists for the purpose of fostering and advancing general aviation activities and interests. Its membership does not include scheduled airlines or those concerned with military aviation. Both NBAA and GAMA prosecute the action on behalf of themselves and their members.

The principal Defendant is the City of Santa Monica, California, which, as aforesaid, owns and operates a municipal airport within its boundaries. Other Defendants are individuals who are members of the Santa Monica City Council.

Leave of Court was given to the following to appear as *amici curiae:*

The United States, appearing by counsel for both the Federal Aviation Administration and Department of Justice.

The People of the State of California, appearing by the Attorney General of California.

The City of Torrance, California.

The Sierra Club.

The City of El Segundo, California.

The City of Lomita, California.

### Laws and Regulations Involved

The ordinances specifically attacked herein are Santa Monica Municipal Ordinances bearing the following numbers:

Section 10101 (night curfew).

Section 10104 (operation of aircraft over city).

Section 10105 (use of airport).

Section 10105A (jet ban).

Section 10105A1 (prohibiting aiding and abetting jet operations).

Section 10105A2 (ban of helicopter training).

Section 10105B (SENEL).

Section 10105D (penalties).

Section 10105E (fees).

Section 10105F (emergencies).

Section 10106 (brakes and tailskids).

Section 10107 (two-way radio).

Section 10108 (radio contact).

Section 10111C (weekend ban on touch-and-go, stop-and-go, and low approach operations).

Section 10134 (discretion of Airport Director).

Also attacked are Santa Monica Municipal Airport Aircraft Operations, Safety and Noise-Abatement Regulations bearing the following numbers: 3, 4, 5, 6, 7, 9, 10, 12, 18, 21, 22, 23, 24, 25, 28, and 31.

The grounds of attack, without specifically stating which items are attacked on which grounds, are:

(1) Violation of the Equal Protection Clause and the Commerce Clause of the United States Constitution.

(2) Invalidity because of preemption arising from federal legislation and FAA regulations.

(3) Breaches of the grant agreements between the FAA and the City through which federal funds were provided to the airport under the Federal Aviation Act.

(4) Breaches of lease agreements between the City and the business concerns who rent space at the airport.

### Prior Adjudications

On April 6, 1979, the Court after extensive briefing and arguments, made a number of declarations of law. No written opinion was filed at that time. The Court's decision of the legal issues then decided was delivered orally and may be found in a transcript of the argument and oral decision of the Court dated April 6, 1979 and filed in the Court file.

The declarations of law made on April 6, 1979, are summarized below.

*Abstention:*

Defendants requested that the Court abstain entirely from entertaining the entire case to allow decision by the state courts as to the contract issues, i. e., those involving alleged breaches of grant agreements and breaches of leases. This claim was rejected because no state court action was then pending, no difficult issues of state law were involved and no federal appellate precedent mandated such abstention.

*Collateral Estoppel Claims:*

Section 10134 of the Santa Monica Municipal Code governs the duties and powers of the Airport Director. In 1974 Judge Lydick of this Court in an action entitled *Antelope Valley Aero Museum, Inc. v. City of Santa Monica, et al.,* case No. CV 74–956–LTL, held a prior version of Section 10134 to be invalid. An ordinance on the same subject, given the same number, but stated in quite different language, was thereafter passed. Plaintiffs claimed that the 1974 decision collaterally estopped Defendants from defending Section 10134 in its present form. That contention was rejected because the two sections are substantially different.

*Exhaustion of Administrative Remedies:*

Prior to the enactment of Section 10105A, the present total jet ban, the City's ordinance contained a presumption that no jet aircraft could meet the City's established noise level limits. But that presumption was made rebuttable and provisions for an administrative proceeding to rebut it, were established (Section 10105B(9)). When the total jet ban was enacted, the provisions of Section 10105B(9) were not repealed, for reasons which are not clear to the Court. The City claimed that that section still provided an administrative remedy which Plaintiffs must exhaust before challenging the total jet ban. The Court rejected that claim. The total jet ban does not provide for any exceptions, and thus any administrative procedure would be futile. The section in question is now meaningless and without purpose.

Defendants made some separate and different claims concerning failure to exhaust administrative remedies. As concerns the grant agreements, the Defendants point out that regulations of the Department of Transportation, 14 C.F.R. Section 151.-7(a)(2), provide an administrative remedy with respect to alleged violations of the grant agreements. They further claim that Plaintiffs are barred from asserting any

claim under the grant agreements for failure to utilize and exhaust said administrative remedies. The Court rejected this contention, holding that said administrative remedies are not available to any entity other than the sponsor, the Airport Authority, and specifically are not available to Plaintiffs or their members.

*Preemption:*

Plaintiffs contended that the ordinance sections and regulations listed in the margin[1] are all preempted by the Federal Government. The contention is two fold: First, that Congress by having legislated generally in the field of regulating the use of airspace has preempted that entire field, and second, that preemption exists by virtue of certain FAA regulations.

■ The Court rejected all but one of the preemption claims involving ordinances and reserved judgment until trial on all of the Regulations in question. As to Ordinance Section 10105F (emergency), the Court held the same to be invalid on preemption grounds by virtue of a direct conflict with an FAA regulation found at 14 C.F.R. Section 91.3.

■ With respect to the ordinance sections dealing with control of noise at the airport, preemption was denied on the ground that a municipal airport proprietor may exercise control over airport noise providing such control is exercised reasonably, non-discriminatorily, and without pointing a "dagger . . . at the heart of commerce." *British Airways Board v. Port Authority of New York,* 558 F.2d 75 (2nd Cir., 1977); *National Aviation v. City of Hayward,* 418 F.Supp. 417 (N.D.Cal.1976).

As to the ordinance sections and regulations dealing with matters other than noise, the Court held that they do not directly conflict with any FAA regulation nor do they invade the sphere of control of airspace which is exclusively within the purview of the Federal Government.

### Oral Opinion

What follows is the Oral Opinion delivered July 20, 1979, which has been somewhat edited.

There are five main issues before the Court for decision today involving essentially five ordinances.

The first is Ordinance Section 10101, the night curfew.

The second is Section 10111C, the weekend and holiday ban on touch-and-go, stop-and-go and low approach operations.

The third is Section 10105A2, the ban on helicopter flight training.

The fourth is Section 10105B, the use of the SENEL method for measuring the noise emitted by an airplane taking off or landing and providing sanctions against a takeoff or landing exceeding a given SENEL standard, which in the case of the Santa Monica Airport is 100.

And the last Section 10105A, the total ban on jet aircraft landing or taking off from the airport.

There are two collateral sections of the ordinance relating to the jet ban which both sides agree must fall if the jet ban falls, but those two collateral sections are separately attacked on grounds different from the attack on the jet ban. These are 10105A1, which defines as a misdemeanor any person counseling, aiding, assisting or abetting anyone else in the takeoff or landing of any jet; and 10105E, which imposes a $5,000 fee for the landing of a jet at the airport and a $10,000 fee for the taking off of any jet airplane.

---

1. *Ordinances*
   - § 10101 (night curfew)
   - § 10105A (jet ban)
   - § 10105A2 (helicopter ban)
   - § 10105B (SENEL)
   - § 10105F (emergency)
   - § 10106 (brakes and tail skids)
   - § 10107 (two-way radio)
   - § 10108 (radio contact)
   - § 10111C (weekend and holiday ban on touch and go, stop and go, and low approach operations)
   - *Regulations*
   - Aircraft operations, safety and noise abatement regulations Nos. 4, 5, 6, 7, 9.

All of the ordinances in issue today are quoted in the margin.[2]

**2.** *Section 10101:*

"Hours. The airport shall be open for public use at all reasonable hours of the day and night, subject to such restrictions as are provided herein or are due to inclement weather, the conditions of the landing area, the presentation of special events and like causes as may be determined by the Airport Director. Night landings will be permitted but night take-offs or engine start-ups are prohibited between the hours of 11:00 o'clock P.M. and 6:00 o'clock A.M., Monday through Friday and 11:00 o'clock P.M. and 7:00 o'clock A.M. on Saturday and Sunday. The Airport Director or in his absence the Watch Commander of the Santa Monica Police Department may approve take-off or landing during said hours, provided it appears that an emergency involving life, or death, exists, and approval is obtained before take-off."

*Section 10111C:*

"Touch-and-Go, Stop-and-Go and Low Approach Operations. Except (i) in the case of an emergency, (ii) where necessitated by safety considerations, or (iii) when required by the Federal Aviation Administration, no person shall operate an aircraft, or cause the operation of such on or at the Santa Monica Municipal Airport, in a manner so as to make a touch-and-go, stop-and-go or low approach operation, as those terms are defined herein-below, during any weekend or legal holiday as set forth hereafter."

*Section 10105A2:*

"Helicopter Flight Training Prohibited. It shall be unlawful for any person to conduct or participate in, or aid or assist any other person in, helicopter pattern flight training operations of any kind or nature at the Santa Monica Municipal Airport at any time. Helicopter pattern flight training shall be and is strictly prohibited at all times at the Santa Monica Municipal Airport."

*Section 10105B:*

"Aircraft Noise Restrictions for the Santa Monica Municipal Airport. Subsection (1). The purpose of this ordinance is to limit the noise in residential areas in the vicinity of Santa Monica Municipal Airport, generated by takeoff and landing operations at said Airport. To accomplish this purpose, these regulations establish quantitative measurement standards for noise levels produced during takeoff and landing operations and designate noise level limits for aircraft noise measured at one or more locations about the Airport.

Subsection (2). Definitions. Each of the terms as used in this ordinance shall be defined as follows:

a) Sound pressure level (SPL): The sound pressure level in decibels (dB), of a sound is twenty times the logarithm to the base 10 of the ratio of the pressure of this sound to the reference sound pressure. The reference pressure shall be 20 micropascals (20 micronewtons per square meter, or 0.0002 microbar).

b) Noise level (NL): The noise level, in decibels, is an A-weighted sound pressure level as measured using the slow dynamic characteristics for sound level meters specified in the American National Standard Specifications for Sound Level Meters. ANSI S1, 4–1971 (or latest revision thereof). The A-weighting characteristics modifies the frequency response of the measuring instrument to account approximately for the frequency characteristics of the human ear. The reference pressure is 20 micropascals.

c) Noise exposure level (NEL): The noise exposure level, in decibels, is the level of noise accumulated during a given event with reference to a duration of 1 second. More specifically, the noise exposure level is the level of the time-integrated A-weighted squared sound pressure for a stated time interval or event, based on a reference pressure of 20 micropascals and a reference duration of one second.

d) Single event noise exposure level (SENEL): The single event noise exposure level, in decibels, is the noise exposure level of a single event, such as an aircraft flyby, measured over the time interval between the initial and final times for which the noise levels of a single event exceeds the threshold noise level. For implementation in these regulations, the threshold noise level shall be at least 30 dB below the numerical value of the single event noise exposure level limits specified in this ordinance.

e) California Airport Noise Standards: The California Airport Noise Standards are defined in the California Department of Aeronautics 'Noise Standards.' California Administrative Code, Subchapter 6, Title 4 (Register 70, No. 48, November 28, 1970), or latest revisions thereof.

f) Aircraft operator: Aircraft operator means the legal or beneficial owner of the aircraft with authority to control the aircraft utilization; except where the aircraft is leased, the lessee is the operator.

g) City: City means the City of Santa Monica.

h) Airport: Airport means the Santa Monica Municipal Airport.

Subsection (3): Methodology. The noise levels generated by aircraft take-offs or aircraft landings at the Airport are to be measured at one or more positions in the vicinity of the Airport. The measurements shall be in terms of the single event noise exposure level (SENEL). The measured SENEL values are to be compared with noise level limits established by this ordinance. An aircraft operator whose aircraft produces noise levels which exceeded the SENEL limits shall be deemed to be in violation of this ordinance.

Subsection (4): Measurement Locations. Measurements shall be made at ground positions on or near the center line of nominal takeoff and landing flight tracks for aircraft operating from the Airport. The nominal flight track is a line projected on the ground under the nominal flight path of the aircraft. The number and location of the measurement positions are to be established by the City.

The initial measurement position shall be established within 300 feet of the intersection of Dewey Avenue and 18th Street. Additional measurement positions may be established as needed to carry out the purpose of this ordinance.

Subsection (5): Frequency of Measurement. At each established microphone location, single event noise exposure level measurements shall be made on a schedule to be established by the City.

Subsection (6). Maximum single event noise level. The City shall set noise level limits for each of the established measurement positions. In no event shall the noise level limits set by the City exceed the maximum values provided in the California Airport Noise Standards for the noisiest aircraft class utilizing the airport on a regular basis. (A regular basis means an average of at least one takeoff or landing per day).

For the initial position established in the vicinity of Dewey Avenue and 18th Street, the SENEL limit shall be 100 dB. This limit may be reviewed and changed by the City after a period of six months of operation of a monitoring station at this position. Noise level limits established for any additional measurement positions similarly may be reviewed and changed after a period of six months of noise monitoring at each position.

Subsection (7). Noise monitoring system specifications. The noise monitoring system shall measure the single event noise exposure level of noise events exceeding the noise threshold established at each measurement position, and shall log the time of occurrence of each event. The performance of the noise monitoring system shall meet the requirements established in Noise Standards, as amended. In general, the overall accuracy of the noise measurement system shall be = 1.5dB as determined in accordance with the procedures specified in Section 5080.3 of the California Airport Noise Standards, as amended.

Subsection (8). Field Measurement Precautions. Specific locations of the monitoring systems shall be chosen, whenever possible, such that the noise levels contributed from sources other than aircraft shall be equal to or less than 60dB. The measurement microphone shall be placed 20 feet above the ground level or at least 10 feet from the neighboring rooftops, whichever is higher. To the extent practical, the following precautions should be followed:

a) Each monitoring location shall be in an open area surrounded by relatively flat terrain having no excessive sound absorption characteristics such as may be caused by thick tall grass, shrubbery or wooded areas.

b) No obstructions which would significantly influence the sound field from the aircraft shall exist within the conical space above the measurement position, the cone being defined by an axis along the line of sight normal to the aircraft and by a half angle of 75° from this axis.

c) When the foregoing precautions are not practical, the microphone shall be placed at least 10 feet above neighboring buildings in a position which has a clear line-of-sight view to the path of the aircraft in flight.

Subsection (9). Noise level limit violation presumption. At the time of adoption of this ordinance, the available noise measurements indicate that make aircraft equipped with turbojet or turbofan powered engines cannot meet the established noise level limits. Thus, in lieu of noise monitoring which the City may initiate as defined in this ordinance, it shall be assumed that operation of turbojet or turbofan aircraft will result in violation of the noise level limits. Therefore, such aircraft will not be allowed to operate from the airport on a non-emergency basis unless the aircraft operator can furnish to the City suitable technical evidence that the aircraft, when operated in accordance with the intended operating procedures, can meet the noise level limits. Suitable technical information may include noise data furnished by the aircraft operator or by the airplane manufacturer."

Section 10105E:

"Fees. In addition to the provisions contained in Sections 10105A, 10105B and 10105D of this Code, it shall be necessary for any person who wishes to utilize the Santa Monica Airport for the purpose of taking-off or landing any fixed wing aircraft utilizing turbo jet or turbo fan engines to pay a landing or take-off fee to the City. Any person who lands or takes-off such an aircraft from the Santa Monica Municipal Airport shall be deemed to have impliedly consented to the payment of such a fee. The fees for the landing of such a jet aircraft shall be Five Thousand ($5,000.00) Dollars and the fees for the taking-off of such an aircraft shall be Ten Thousand ($10,000.00) Dollars and the monies collected from such fees shall be based upon, and used to defray the expense of defending against, and the costs of, any claims made against the City of Santa Monica arising from the use of the Santa Monica Airport by jet aircraft. No person shall take-off or land any aircraft specified in this section unless and until all such fees have been paid. The Airport Director shall not release from impound any aircraft prior to the payment of such required fees."

Section 10105A1:

"Assisting Another In the Landing Or Taking-Off of Jet Aircraft. Any person who counsels, aids, assists or abets any other person in the taking-off or landing of any fixed wing

Each of the five ordinances being challenged is challenged under the Constitution—on preemption grounds, on equal protection grounds and as an impermissible burden on interstate commerce.

There are also challenges other than constitutional. These are based on the grant agreements and leases. I intend to deal with the constitutional matters first on all of the ordinances and then proceed to decide the non-constitutional matters.

As to the constitutional challenge based on preemption, I ruled last April that the preemption challenged would be denied as to all of the ordinances that I have mentioned. My declaration of law at that time and the accompanying transcript contains a somewhat lengthy exposition of the reasons underlying that April holding. If it is necessary or appropriate, I readopt today those holdings and the legal principles then enunciated.

Before stating my holdings on each of the five issues, I want to discuss and adopt the standard which is applicable in deciding constitutional validity under the headings of equal protection and the commerce clause, the standard that will be applied in deciding the validity of each of the five ordinances. I adopt the same standard for each of the five as to the equal protection challenge. I also adopt the same standard as to each of the five for deciding the challenge based on the commerce clause. The equal protection standard and the commerce clause standard are of course different. So I move to the discussion of the equal protection standard.

█ Each of the ordinances in question, for equal protection purposes, must be regarded as an economic regulation. None of the five ordinances involves any suspect classification or the regulation or control of fundamental personal rights. The distinction between economic regulations and the other types of situations, that is, suspect classifications and fundamental personal rights, is made in many Supreme Court cases. Among the best of such discussions is that found in *City of New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976), which case is cited and relied upon by both sides in the present proceeding.

The teachings of the Supreme Court with respect to equal protection challenges to economic regulations are reasonably clear. An excellent statement of the standard to be used is also found in *City of New Orleans,* 427 U.S. at page 305, 96 S.Ct. 2513.

As the Supreme Court puts it, to validate such economic regulations, it is required only that the regulation, and the classification established thereby, be found to be "rationally related to a legitimate state interest."

This is the standard which Defendants have urged upon the Court, and this is the one which I adopt. I believe that I am bound to adopt it under case authority to the Supreme Court. But I also believe it to be the desirable standard in terms of the respective interests and rights of the states and local governments in our federal system.

Plaintiffs, of course, cannot, and they did not, overlook the language used in the recent Supreme Court opinions in this field. But they prefer the language used by the Supreme Court in 1920 in *F. S. Royster Guano Company v. Virginia,* 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920), namely that the "classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike . . ."

In my view, the recent cases undermine that language.

Plaintiffs also argue based on Footnote 5 in the Supreme Court's opinion in *City of New Orleans* that where the same case involves an equal protection challenge and another constitutional challenge, such as a challenge based on the commerce clause, a

aircraft utilizing a turbo jet or turbo fan engine in, at or upon the Santa Monica Municipal

Airport at any time is guilty of a misdemeanor."

more strict standard than the one I mentioned earlier, i. e., "rationally related to a legitimate state interest," must be used.

Plaintiffs use that footnote to justify a claim that the rights being adjudicated here are a step above, in quality, regulations involving economic matters.

I disagree with Plaintiffs. I do not so read that footnote. I note that that footnote does not clearly mandate the use of a different test for such cases. I also note that the footnote, which appears in a Per Curiam opinion, has never been cited, used or expanded since it was written.

Incidentally, I also think that Plaintiffs' citation of *Trimble v. Gordon,* 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977), does not help them, because there the rights being adjudicated were the right of illegitimate children—obviously higher rights than economic rights.

█ I should also add that in terms of equal protection, an inquiry as to whether there is a preferable, easier or better method to accomplish the legislative goal is irrelevant. For equal protection purposes, the city or the state is not required to use the most modern or the easiest or the best method of accomplishing its purpose.

█ I leave the subject of the equal protection standard and proceed now to the commerce clause standard.

In determining the test to be applied whenever there is a claim that local regulation impermissibly burdens interstate commerce, trial courts turn to the plethora of holdings on that subject by the Supreme Court. That issue, impermissible burden on interstate commerce, has through the decades occupied the Supreme Court as much as any other single subject.

The standard that a trial court is to apply in such cases is well expounded in *Raymond Motor Transport, Inc. v. Rice,* 434 U.S. 429, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978), decided by the Supreme Court last year.

Instead of composing some new language, the Court in *Rice* quoted with approval some language, relied upon by both sides in

the present case, from a case called *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). The language is important and I will quote it at some length:

"Although the criteria for determining the validity of state statutes affecting interstate commerce have been variously stated, the general rule that emerges can be phrased as follows: Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits . . ."

Some citations are now omitted, and I continue the quote:

"If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities."

None of the Supreme Court opinions rendered thus far involves airport regulations challenged under the commerce clause. When an interstate commerce challenge is advanced against an airport regulation, the two best and clearest authorities that I have found to chart a trial court's approach to the problem, and the standards to be used, are the Second Circuit's opinion in *Concorde II,* cited as *British Airways v. Port Authority,* 564 F.2d 1002 (2nd Cir., 1977), and *National Aviation v. City of Hayward,* the opinion of Judge Peckham found at 418 F.Supp. 417 (N.D.Cal.1976).

In *Concorde II,* Judge Kaufman expressed the test as follows:

"The maintenance of a fair and efficient system of air commerce, of course, mandates that each airport operator be circumscribed to the issuance of reasonably, nonarbitrary and nondiscriminatory rules defining the permissible level of

noise which can be created by aircraft using the airport . . ."

Citations, and continuing the quote:

"We must carefully scrutinize all exercises of local power under this rubric to insure that impermissible parochial considerations do not unconstitutionally burden interstate commerce or inhibit the accomplishment of legitimate national goals."

Judge Peckham in *Hayward* laid out a multi-step and considerably more complex expression of the test as follows. I am not quoting here but abstracting from the *Hayward* opinion.

Step 1: Determine whether there is an effect on interstate commerce. If there is no effect, the inquiry is over. There is no need for further inquiry. If a *de minimis* effect is found, I would construe that the same as a finding of no effect.

Step 2: If there is an effect found, the next issue is whether the legislative body " . . . has acted within its province and whether the means of regulation chosen are reasonably adapted to the end sought." Those words are a quotation from a Supreme Court opinion in *South Carolina Highway Dept. v. Barnwell Bros.*, found at 303 U.S. 177, 190, 58 S.Ct. 510, 517, 82 L.Ed.2d 734 (1938).

Included in this step 2 is an inquiry as to whether the legislative action discriminates against interstate commerce or not.

Step 3 is a balancing of the burden imposed on interstate commerce against the local interests supporting the legislation. In *Pike,* the Supreme Court says (at 397 U.S. 142, 90 S.Ct. 844) that if the regulation is non-discriminatory and for the effectuation of "a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."

As Judge Peckham points out in *Hayward,* there is language in some Supreme Court opinions before *Pike* which seems to express a different proposition and involves

no balancing: The proposition to which he refers is that, once it is deemed that the legislation is a reasonable means of achieving a non-discriminatory legitimate goal, the inquiry is over. Judge Peckham points out, I think correctly, that whenever that nonbalancing approach is taken, the interest being served by the regulation is a matter which the Court has called a "peculiar local concern."

How one determines whether a legislative purpose rises to the dignity of a "peculiar local concern" has not been charted for us by any court insofar as I can determine. In the Supreme Court's opinion in *Barnwell,* there appears a list of such matters at 303 U.S. 187, 58 S.Ct. 510, a list of what I believe is meant by "peculiar local concern," although those words are not used. That list includes regulations of harbors, piers and docks, quarantine regulations and game laws. Local safety also seems to have been brought within the ambit of "peculiar local concern" in *Brotherhood of Locomotive Firemen and Enginemen v. Chicago, Rock Island etc.,* 393 U.S. 129, 89 S.Ct. 323, 21 L.Ed.2d 289 (1968). And there is an interesting opinion in the Ninth Circuit, *Construction Industry Association of Sonoma County v. City of Petaluma,* 522 F.2d 897 (9th Cir., 1975), which, without using the words "peculiar local concern," seems to bring environmental concerns into that concept of "peculiar local concern."

*City of Petaluma* involved some city restrictions on housing developments undertaken to correct an imbalance between single and multi-family dwellings and to retard what the city felt was an improper growth rate.

So, as Judge Peckham did in *Hayward,* I assume arguendo that the Supreme Court left us with two lines of authority involving two different kinds of standards and tests depending on whether there is a finding of "peculiar local concern". As he did in *Hayward,* I am going to make my holdings on each of the five ordinances on both assumptions. I adopt the three-step approach used in *Hayward,* and note that Judge Peckham derives it from *Pike* and other authoritative

Supreme Court opinions; and obviously I believe the test as outlined in *Hayward* is a correct statement of the law.

So, at long last, I am going to leave the discussion of standards and I now commence the findings applicable to this case.

As above stated, it is of importance to determine the extent of the burden on interstate commerce resulting from each regulation in question and to characterize that burden.

As to all of the ordinances in question except the jet ban, I find each to be an indirect burden on interstate commerce and an incidental burden thereon.

As to all except the jet ban, I also find each ordinance to be an insubstantial burden, if any, on interstate commerce. In this connection, as to the training inhibitions, I am not greatly impressed with the argument that if pilots cannot train on weekends and holidays, and if helicopter pilots cannot train at all at Santa Monica, less people will become pilots and less aircraft will be sold; resulting in an alleged burden on interstate commerce.

I also find that none of the five ordinances have the effect of discriminating against interstate commerce.

So, I now proceed to a discussion of each of the five ordinances and the decision in respect thereto.

First is Section 10101, the night curfew.

█ I reject the challenges to this ordinance and find it valid in all respects. As concerns the equal protection challenge, I find this ordinance to be rationally related to a legitimate state interest, namely, the control and prevention of noise at the airport during the hours when most of the population in the area surrounding the airport are asleep.

As to the commerce clause, here are my findings:

On step 1, —whether there is an effect on interstate commerce—, I find there is some effect. I have already characterized it as indirect, incidental and insubstantial.

In making my judgments about the effect on interstate commerce as to all of the ordinances, I have of course considered the argument advanced by plaintiffs about the so-called domino effect. The argument goes like this: If this Court validates any of these ordinances, it becomes an open invitation to other similar airports to enact ordinances of the same type. Thus the argument is that the effect on commerce is not to be viewed or measured by the effect at the Santa Monica Airport alone, but the Court must anticipate what other similar airports will do, in Southern California and perhaps around the country, and must weigh that entire predicted course of action and its effect on interstate commerce.

As Judge Peckham did in *Hayward*, I view such an approach and contention as highly speculative. No Supreme Court case requires me to take such an approach. There is language about the domino effect in *City of Burbank v. Lockheed*, 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973), but that was a purely preemption holding.

To take the domino approach would make every airport operator the prisoner of every other airport operator, even if he is the first to initiate a given type of regulation.

I reject the argument, as did Judge Peckham in *Hayward*; but even if the argument has validity, it would not change the nature of my previous findings about the extent of the burden on commerce. Throughout my discussion it should be borne in mind, as I stated earlier, that the Santa Monica Airport is not susceptible of accommodating commercial airlines. The runway there is simply not long enough.

Let me then, under the heading of burden on interstate commerce and still dealing with the night curfew, go to step two.

I find that the legislative body has acted within its province and that the means of regulation chosen are reasonably adapted to the end sought, as I noted previously.

I also find that the interest being protected, protecting the sleep of the surrounding residential community from the noise of aircraft operations at night, is a matter of

peculiar local concern. That finding would end the inquiry. And I recall that the *Hayward* opinion calls noise control by an airport proprietor a matter of peculiarly local concern.

But whether noise control generally is or is not a matter of peculiar local concern, it certainly is true that noise control of this kind, involving the night sleeping comfort of surrounding residents, is a matter of peculiar local concern.

I again make some arguendo findings. Assuming arguendo the matter is not ended with step two, I would go to step three, the balancing of the burden imposed on interstate commerce against the local interests supporting the legislation. Here the balancing is clearly and convincingly in favor of the legislation. Any noncommercial aircraft desiring to land in the western area of Los Angeles at night can land at LAX, an airport reasonably close to the Santa Monica Airport. And at LAX, night hours are off-peak hours.

█ I leave the night curfew and move to the second ordinance, Section 10111C, the weekend and holiday ban on touch and go, stop-and-go and low approach operations.

I reject the challenges to this ordinance and find it valid in all respects. I find this ordinance, as concerns the equal protection challenge, to be rationally related to a legitimate state interest. That interest is the control and prevention of noise at the airport during the hours when most of the population in the residential area surrounding that airport are at home for the weekend and either at leisure or at rest.

The evidence convinces me that the existence of this ordinance, as it was designed to do, does result in materially cutting down the frequency and noise production of training operations from the level they would attain if the ordinance were not in effect. Touch-and-go particularly involves frequent and repetitive operations because the subsequent takeoff immediately follows the landing.

This ordinance cannot be called sham noise control in any respect. It is true that the type of planes usually used in training are among the least noisy of the aircraft permitted to use the airport. It is also true that touch-and-go, stop-and-go and low approach training have great value in the training of new pilots and in preserving the continued proficiency of those already licensed. But those values do not detract from the basic finding I have made that the ordinance is a noise control ordinance rationally related to a legitimate state interest.

Now, as to the commerce clause. My findings as to this ordinance will parallel those made in connection with the night curfew.

As to step one, I find there is some effect on interstate commerce. But, as previously stated, I find it to be indirect, incidental and insubstantial.

As to step two, I find that the legislative body has acted within its province and that the means of regulation it has chosen are reasonably adapted to the end sought.

I also find that the interest being protected, the minimization of noise during the weekend hours when the need for leisure and rest in the residential community is the highest, is a matter of peculiar local concern.

That finding should and would end the inquiry under the commerce clause. But assuming arguendo that the inquiry is not ended with that finding, I proceed to step three, which involves the balancing of the burden imposed on interstate commerce against the local interest supporting the legislation.

The evidence is clear and convincing that the balance is greatly in favor of the legislation. Training activities of all the types involved, touch-and-go, stop-and-go and low approach, are permitted at this airport on days other than the weekend, and are permitted at other airports in the area.

Incidentally, this ordinance is sought to be justified alternatively as a safety measure. I am unconvinced by Defendants' testimony in that regard, and I find that there are no safety factors served by this ordi-

nance. The only factors actually served are noise factors.

■ I proceed now to the helicopter training ban ordinance, Section 10105A2.

The Santa Monica Airport permits helicopters to be based at the airport and to take off and land when such operations are not part of training exercises. But all helicopter *training* is banned by the ordinance. Piston-engine training is permitted at the airport except for the specific training maneuvers just mentioned which are prohibited on the weekends and holidays.

The ordinance now being discussed, Section 10105A2, prohibits all helicopter training on all days of the week. It is justified as both a safety and noise regulation.

As to safety, the evidence is unconvincing. I find that there is no more safety problem from helicopter training than from piston-engine training. I find the ordinance cannot be justified as being reasonably related to a safety objective. I also find that there would be no intermix of traffic, or in traffic, if the helicopter training were allowed.

But now we come to the noise justification. And when one sets out to determine the validity of this ordinance one must of course postulate where and how helicopter training would take place if it were allowed. Both sides have postulated that if this ordinance falls, helicopter training would be regulated in the same way that it was previously regulated when such training was allowed before the passage of the ordinance. This regulation involves a training pattern confined to the general area of the northeast portion of the airport, the portion which is reserved for helicopter operations. Training helicopters, like other helicopters, would have to rise to 500 feet and would then follow a close pattern, generally within the confines of the northern portion of the airport. A large part of that pattern is over a commercial development and over empty land, but some of it is over a new condominium area. And that pattern is also immediately adjacent to many residences.

As a noise measure, the helicopter training ban is justified on the ground that helicopter noises, particularly at 500 feet and under, are of a different, more pervasive and more objectionable character than noises emanating from fixed-wing aircraft; and that helicopter training, like other flight training, is more repetitive than normal flight operations in which an aircraft either takes off from the airport bound for another destination, or lands at the airport arriving from another place. This argument is that trainees have to practice, and practice equals repetitive operations. I agree with both contentions and so find, and I find there is a reasonable basis for this ban on both justifications, i. e., repetitiveness and the different character of noise.

Thus, as to equal protection, I find the ordinance to be rationally related to a legitimate state interest, namely, the control and prevention of noise at the airport.

Now I proceed to the commerce clause. On step one, I find the helicopter training ordinance to have an incidental and indirect effect, if any, on interstate commerce. And I find that its effect, if any, on commerce is insubstantial, since the prohibition of training is far different in character from regulations banning types of aircraft or even hours of operation.

As to step two, I find that the legislative body has acted within its province and that the means of regulation chosen are reasonably adapted to the ends sought.

I also find that the interest being protected, the tranquillity of the community and its freedom from the pervasive and irritating quality of repetitious helicopter noise at low altitude, is a matter of peculiarly local concern.

If, arguendo, the inquiry is not ended with step two, as to step three I find that in balancing the burden imposed on interest commerce against the local interest supporting the legislation, the latter, the local interest, far outweighs the former.

I want to proceed now to the SENEL ordinance, Section 10105B.

The acronym "SENEL" stands for single event noise exposure level. This is a method of measuring in decibels the amount of noise emanating from an airplane over a period of time. Readings are obtained by a meter hooked to a computer. There are two such meters at Santa Monica Airport at locations pictured on Joint Exhibit 37–C. They are positioned so as to be particularly able to measure the noises resulting from takeoffs and landings. The ordinance sets a 100 dB reading on the SENEL meter as the maximum amount of noise which an aircraft may make. There are civil and criminal penalties prescribed in the ordinance for violation of the 100 dB limit. The meters are set so they are not activated and the readings do not commence unless and until the noise emanating from a given plane registers 75 dB.

Plaintiffs' attack on this ordinance does not involve equal protection. It is attacked under the commerce clause, and it is attacked under a preemption doctrine.

■ First as to preemption. A basic contention of Plaintiffs is that the SENEL ordinance on its face is preempted by FAA regulations governing airspace. I rejected this claim in my earlier declaration of law back in April. At the trial, Plaintiffs have made a related claim to which they give the name "preemption as applied." I know of no prior case employing that combination of words or that concept. But I must nevertheless make some findings about the claim.

Plaintiffs say that the SENEL method of governing noise made in takeoffs and landings, particularly takeoffs, induces pilots to engage in unsafe and improper practices for the purpose of what airmen call "beating the box." That phrase means avoiding exceeding the 100 dB level. Plaintiffs say that such practices involve power cutdowns and altitude or rate-of-climb changes during takeoff, which are unsafe practices. To the extent that these practices exist, they appear to be violations of FAA regulations and are punishable as such.

Plaintiffs say that because the SENEL system induces such practices within the airspace and as a part of flight, it amounts to a local regulation of airspace and flight which matters are within the exclusive domain of the federal government. This is essentially what is meant by the claim of "preemption as applied."

I reject that claim. We deal with an ordinance which is a regulation of noise made by airplanes landing and taking off from Defendants' airport. It is not a regulation of airspace or flight. The fact that pilots flying in noisy airplanes whose normal operations bring those planes close to the 100 SENEL limit, may on occasion take some improper and even illegal measures to avoid being cited by the City for going over the 100 SENEL limit, does not make what is an otherwise unpreempted local noise control ordinance preempted in fact or as applied.

Plaintiffs characterize what these pilots do in trying to beat the box as unsafe. Incidentally, the testimony did not convince me that there is very much, if any, of a safety problem involved. And also it did not convince me that the problem of "beating the box" is as frequent or serious as Plaintiffs make it out to be. If there is any safety problem, the FAA has plenty of authority and reason for redressing the safety problem themselves, and directly. Law violators commonly do many unsafe things in the course of the violations and the fact that there is a tendency to violate, and to do so unsafely, does not make the law they violate improper or illegal.

■ Plaintiffs in addressing SENEL also seem to make an argument of vagueness, which subject is usually classified under the heading of "due process." I do not remember the Plaintiffs in writing or in argument making any specific due process claim. But I want to state the essence of that argument and deal with it, whether it is regarded as a due process or a commerce clause attack.

The argument is essentially this: A given plane may on most days, during a takeoff or landing, particularly takeoff, be within the 100 SENEL limit; but on certain other days or times, depending on weather, atmo-

spheric conditions, pilot practices, and perhaps even engine variability, that plane may exceed the 100 limit. So, say the Plaintiffs, a given pilot making a given landing or takeoff doesn't know whether he will violate the law. Such uncertainty, argue Plaintiffs, renders the SENEL ordinance unreasonably vague and therefore invalid.

If the contention is that the standard is imprecise, I must reject it without too much discussion. The 100 SENEL standard is extremely precise. What the Plaintiffs really complain of is that a pilot who operates an airplane which is normally near the 100 level, takes some risk, depending on these climate and other factors I have mentioned, of going over the 100 level in a given maneuver or operation. I don't think that the existence of such risk can make the standard imprecise or otherwise invalidly vague. Under the testimony, the biggest variability in putting these near-the-margin kinds of airplanes over or under the 100 level in a given operation, is the pilot himself. So the matter is one largely within the pilot's control.

I now turn to the attack on the SENEL ordinance under the commerce clause. And following the analysis that I previously made, we have to take it a step at a time.

Step one is whether there is an effect on interstate commerce. I find the effect on interstate commerce of the SENEL ordinance indirect, incidental and insubstantial. The only effect it really has is to keep noisy airplanes away from the airport. The testimony indicates that there are dozens of types of aircraft that can meet the present standard, and those types operate regularly out of this airport in compliance with the ordinance. And the evidence indicates that the aircraft industry is improving its techniques so that more and more types of airplanes can comply.

Step two assumes arguendo that there is an effect on commerce, and inquires if the legislative body has acted within its province and whether the means of regulation chosen are reasonably adapted to the ends sought.

My findings are in the affirmative in both respects as to this ordinance. There is a legitimate purpose, the control of noise and the exclusion of overly noisy airplanes. And the means of regulation are reasonably adapted to that purpose. As previously held, I find this noise purpose to be a peculiarly local concern, and the inquiry under step two should stop here. If for any reason the findings previously made are wrong, I go on arguendo to step three and make the findings required by it.

Step three is the balancing of the burden imposed on interstate commerce against the local interests supporting the legislation. Again I find that the burdens, which I have already characterized as minimal, are greatly outweighed by the local benefits and interests which support the legislation.

I believe that I mentioned earlier that in step three, if one gets that far, one of the facts that can be taken into account in the balancing process is whether the local purpose can be promoted as well as by some other method of control, with a lesser impact on interstate commerce or activities.

Language to that effect is found in *Pike v. Bruce Church, supra,* and again in the recent *Rice* case, *supra.*

To actuate such an inquiry, however, I think there is required to be shown some substantial burden on interstate commerce; and I have already found that the SENEL ordinance does not impose any substantial burden. But, again, let us assume arguendo either than *any* burden requires an examination of alternative methods or that the SENEL ordinance imposes a substantial burden. I make these assumptions arguendo.

Much of the trial has been taken up with Plaintiffs' contention that some combination of other methods preferable to SENEL and involving a lesser burden should be used. The alternative method urged has as its main component the exclusion or acceptance of types of planes based on ratings which the FAA gives to various types of planes under a system known as FAR 36.

I find that the local interests cannot be promoted as well with this alternative method because it would not protect the City from pilots who fly in a particularly noisy manner or from particular individual planes which deviate from the ratings given their type by the FAA.

It would also involve the City in much more difficult and expensive regulation, because whether a given airplane is barred or allowed to use the airport depends on visual identification of each plane involved in each operation. The evidence indicates that many types of planes present the same or similar silhouettes; and some with identical or near-identical silhouettes have different and more noisy power plants than others. So the problems of administration would be great.

The Plaintiffs suggest that FAR 36 could be supplemented by a system of noise monitoring called CNEL. That is a system of computerized monitoring of total noise in a community measured over a 24-hour period. Plaintiffs suggest that CNEL be used to aid the City in determining at what rating level under FAR 36 the City should set the cutoff line, banning planes which exceed the given level.

I find that such a combined method does not involve any lesser impact on interstate activities than SENEL and is not as direct, effective and desirable a method of promoting the local interest.

I must say one other thing with respect to the subject which I am now discussing, namely, whether the local purpose can be promoted as well with a lesser impact, using another method. I do not believe that under the law the City is required by any of the case law or the Constitution to adopt any particular system of noise control for given airplane landings or takeoffs. It is not required to adopt the best or most advanced system. The inquiry is only whether the system adopted is a reasonable method of achieving a legitimate purpose. Certainly a marginally better system is not required where both systems have substantially the same impact on interstate commerce.

I leave the SENEL ordinance and come now to the last ordinance, the jet ban.

The ordinance banning jets at the Santa Monica Airport, Section 10105A, presents different legal questions than the subsidiary ordinances, Sections 10105A1, and 10105E, which impose various penalties for violating the jet ban.

As I stated earlier, if the jet ban ordinance is held invalid, the penalty ordinances also fall. Defendants conceded this in the argument.

As to the jet ban, § 10105A, my holding is that that section is unconstitutional. I make the holding on two alternative grounds. First, the section violates the equal protection clause; and, second, it also imposes an impermissible burden on interstate commerce.

This section, 10105A, is justified as both a noise and safety regulation. I find that neither justification exists in fact. The section cannot be viewed as a bona fide local regulation enacted for either noise control or safety purposes.

As to safety, the evidence is utterly convincing that modern, small, business or executive-type jets of the type that would be able to fly out of this airport with the jet ban lifted, are at least as safe, if not much safer, than the types of piston-engine fixed-wing aircraft which are now allowed to use the airport.

The noise control justification deserves little more extended treatment. I find that in terms of the quality of the noise produced by modern type fan-jets and its alleged tendency to irritate and annoy, there is absolutely no difference between the noise of such jets and the noise emitted by the louder fixed-wing propeller aircraft which are allowed to use the airport.

The testimony that we have heard of a scientific nature contending that there are certain components of fan-jet noise that are scientifically differentiated from noise produced by piston planes did not convince me. Even if it is true, I am convinced that whatever difference exists is insignificant

and not meaningful. For purposes of noise control, I find these jet noises—and I want to be specific, we are talking about the noises emitted by the newer types of executive and business jets—and those of the louder types of propeller planes allowed to use the airport, to be the same.

To be sure, older types of jets, including the pure jets, did make significantly different noises, louder, shriller and more irritating, than the noises of prop planes. But the executive jet industry has progressed greatly in recent years and the testimony is completely convincing that the few executive and business jets which can meet the 100 SENEL level cannot be validly excluded from this airport and cannot be discriminated against because that discrimination is unreasonable.

Let me make the necessary findings and conclusions.

As to equal protection first. As I have throughout my holdings, I recognize here that under the teachings of the Supreme Court, great deference must be given to legislative determinations involving economic regulations. But even with that mandated deference, I find that this ordinance is not rationally related to any legitimate state interest, whether that interest be safety or the prevention of noise.

In defending the jet ban and possibly anticipating the holdings I have made about the fact that there is no difference in quality of noise, and knowing that certain business and executive jets exist which can meet the 100 SENEL test, the City during the trial and argument fell back to a new and interesting secondary line of argument. The City says that if the 100 SENEL level is valid, an 88 SENEL level would also be equally valid; and an 88 level would serve to exclude all business and executive jets because none of them can make the 88 limit. The City pointed out that the Torrance Airport has an 88 SENEL limit.

So, says the City, within our permissible area of regulation, we can decide even arbitrarily whom to let in and whom to exclude. We can let in noisy prop planes within the 88 to 100 SENEL range, and we can exclude jets falling within that same range if we want to.

The City in making this argument relies on some general language from the cases that in exercising the police power a city doesn't have to exercise its maximum authority and doesn't have to solve every evil.

That black letter proposition is, of course, valid; but it is not applicable to the current situation and problem. As long as the level stays at 100, no discrimination between jet and prop planes is permitted. I offer no opinion as to what would happen if the City changed the 100 level to a figure which in today's technology would exclude all business and executive jets as they now exist.

I must finish the findings by going to the commerce clause aspects of the jet ban.

I find the impact on commerce from the jet ban to be a direct burden since it prohibits interstate travel in jets, even in those which can meet the local noise requirement. The burden is thus not incidental; and I so find. And I find that the burden is not insubstantial.

I have already found that the jet ban is not in fact reasonably adapted to either justification given for it. Thus, there is no basis for invoking the "peculiar local concern" concept.

If, arguendo, the Court must get to the balancing, which means that the jet ban would be found to be in some fashion reasonably adapted to the purpose or end sought, I would find that the burden imposed by it on interstate commerce outweighs the local interest supporting the legislation, and the ordinance therefore is an impermissible burden on interstate commerce.

Let me move to the penalties.

The holdings I have made on the jet ban have the necessary effect of invalidating the subsidiary penalty ordinances. But as I said earlier, those penalty ordinances considered alone can present a different legal problem than does the jet ban considered alone. So in the interest of completeness of adjudication, I am going to make findings

and holdings with respect to the penalties sections which findings and holdings assume arguendo that the jet ban ordinance itself is held valid by some higher authority.

Section 10105A, the jet ban, makes violation a criminal misdemeanor. Section 10105A1 likewise makes it a criminal misdemeanor to aid, abet or assist any other person in violating the jet ban section.

I find no problem or illegality with that section per se. It will stand or fall directly with the jet ban section. If the jet ban is valid, the aiding and abetting section is likewise valid. And conversely, if the jet ban is invalid, the aiding and abetting section necessarily falls.

I go to 10105E. That provides for a fee to be imposed in the event a jet aircraft is landed at the Santa Monica Airport or takes off from it. The fee for landing is $5,000. The fee for taking off is $10,000. The section then goes on to authorize the airport director to retain control and possession of the aircraft until the fee is paid. That is called an impound, and the impound is provided for in another section, Section 10105D. As I understand a stipulation of the parties, the City has stipulated and agreed that all impound provisions authorizing retention of aircraft without a hearing are invalid. For that reason I will no longer concern myself with any impound provision in Section 10105E; and I will limit my discussion to the fee provisions of that section.

I agree with the Plaintiffs that nothing is gained, nor is the validity of the exaction of these large sums of money saved, by the City's use of the word "fee." A fee for usage of the airport, to be a legitimate fee and not a sham, must bear a reasonable relationship to other fees charged for similar usage. If that reasonable relationship does not exist, the alleged fee is invalid.

The fees charged by Santa Monica for takeoff and landing and other uses of the airport by prop planes are far, far less. As I recall, for noncommercial use there is no fee at all; and for a commercial use it is a maximum of $25.

I also agree with Plaintiffs that these alleged fees are in fact penalties and construe them to be such. I point out that one doesn't even have to be convicted of a criminal offense to have these $5,000 and $10,000 penalties assessed against him.

I adopt the legal analysis that Plaintiff advanced on the second day of argument as follows: If this $5,000 charge for landing and $10,000 charge for takeoff had been imposed as a sanction or penalty for a criminal violation, it would be a cruel and unusual punishment and unconstitutional as such. It would be a cruel and unusual punishment because it is extremely disproportionate to the nature of the offense. A fortiori, as a civil penalty, it is void and illegal.

Analytically, I would believe that the validity of this penalty is governed by state law because this is a municipal ordinance. But whether I am applying state law or federal law, the results are the same.

As I have been speaking, I have made a mental note of the fact that I haven't made any comment or finding on one of defendant's alleged safety contentions. Defendants have offered the evidence of an expert that aircraft noise is in some fashion directly related to the incidence of disease and death among the surrounding residential population. Using this evidence, they have attempted to make a safety issue out of every issue before me.

I must tell you that on this particular claim, the evidence offered was completely unconvincing and I find that no relationship has been shown between aircraft noise at its present level, (or as it would be increased or changed with the invalidation of any or all of the ordinances in question) and the incidence of death or disease among the Santa Monica population in the area surrounding the airport.

I want to turn now to the claims grounded on the grant agreements and the Federal Aviation Act.

Where I have rejected the constitutional challenges, I now reject also the non-constitutional challenges based upon the grant

agreements which are made pursuant to the Federal Aviation Act.

In the case of the jet ban and the penalties, where I have ordered relief and have stricken down an ordinance, I want to make it clear that I do not do so because of any claimed right under the grant agreements or under the Federal Aviation Act.

Plaintiffs argue that the Plaintiff Association and the Plaintiff-Intervenors Associations may enforce the grant agreements because some of their members are third-party beneficiaries of the grant agreements. The agreements to which we refer here are agreements between the FAA and the City of Santa Monica providing for the advancing of federal funds for the airport and stipulating many things concerning the nature and operation of the airport as built with those funds.

Plaintiffs are particularly wedded to the concept that provisions in the grant agreements that the airport "shall be available for public use on fair and reasonable terms and without unjust discrimination" give rights of action to the Plaintiffs as third-party beneficiaries.

I start with the proposition that in defining what is a third-party beneficiary, we look to state law. The opinion of the Supreme Court in *Miree v. DeKalb County,* 433 U.S. 25, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977), seems to command that anomalous result, anomalous because the agreements are federal contracts.

So we look to state law. I do not agree with the Plaintiffs that either the three Plaintiff Associations, or any individual members thereof who use the airport or lease space at it, may enforce the grant agreements as third-party beneficiaries. I do not find any of them to have the status of third-party beneficiary. I agree with the position of the FAA as amicus on this issue that they are not third party beneficiaries, and I find accordingly.

I also find that none of the provisions of the Federal Aviation Act relied on by Plaintiffs vest any private rights of action.

But assuming arguendo that some or all of the Plaintiffs, or their members, are third-party beneficiaries, and assuming arguendo that private rights may be enforced under the Federal Aviation Act, I find there have been no breaches of the grant agreements or of the Federal Aviation Act as to the ordinances which I have upheld against constitutional attack.

And I note that Plaintiffs-Intervenors (as distinguished from Plaintiff) do not claim that the grant agreement rights and the Federal Aviation Act obligations are any broader or different than the constitutional issues. That claim is made only by Plaintiff, and I have rejected it.

Last of all, I deal with the alleged rights under the airport leases.

Plaintiff SMAA, in its fourteenth cause of action, sues in a different capacity than it does in the rest of its causes of action. In the others it sues as an association made up of pilots and aircraft owners who use the airport and other members. In the fourteenth cause of action, SMAA sues as the assignee of various lessees at the airport, including aircraft dealers, gasoline suppliers, flight instruction organizations, and so forth. Each of those assignors, in his own right, claims that the ordinances under attack constitute a breach of the lease between it and the City. Each asks for equitable relief only. No money damages are mentioned or prayed for.

I have been over these leases, and particularly the provisions thereof that these assignor lessees claim have been violated. I find that none of the ordinances in question constitute a violation of any provision of any lease. That finding also includes the jet ban, which of course I have invalidated on constitutional grounds only.

A Final Judgment shall be drawn in conformity with the foregoing.